936 A.2d 414

ROBERT MAGLIES, PLAINTIFF–RESPONDENT, v. ESTATE
OF BERTHA GUY, DEFENDANT, AND SHERRI
JENNINGS, INTERVENOR–APPELLANT.

Argued February 13, 2007—Decided December 12, 2007.

*Michael E. Gildenberg* argued the cause for intervenor-appellant (*Paul V. Mullin,* Executive Director, Central Jersey Legal Services, Inc., attorney). *Christopher J. Hanlon* argued the cause for respondent (*Hanlon & Niemann,* attorneys; *Mr. Hanlon* and *Robert Maglies,* pro se, on the briefs).

*Connie M. Pascale* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney; *Mr. Pascale and Mr. Miller,* on the briefs).

*Tracey Goldstein* argued the cause for amicus curiae New Jersey Apartment Association (*Feinstein, Raiss, Kelin & Booker,* attorneys; *Ms. Goldstein and Gary D. Gordon,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal, we address whether New Jersey's Anti–Eviction Act (Act), *N.J.S.A.* 2A:18–61.1 to –61.12, allows the causeless eviction of a daughter, after the death of her mother, where the landlord consented to the daughter's residence and where the daughter's income factored into the family contribution and federal voucher subsidy paid to the landlord. *See* 42 *U.S.C.A.* § 1437f(*o*) (Section 8 program). The Section 8 program enables surviving family members of low-income households to be requalified for ongoing assistance quickly so that personal dislocations do not result from the oft-sudden and devastating loss occasioned by the death of a household family member. In this particular matter, Section 8 rental assistance will continue to support the daughter, who before had been denominated by the landlord and by the Section 8 program as a "member" of this voucher-supported tenancy. However, because the daughter was not the "tenant," the landlord has refused to accept either rent or the Section 8 voucher presently payable in the daughter's name.

Federal law governing the Section 8 program does not answer whether a surviving resident in a Section 8 household has any continued entitlement to possession of the premises. Rather, this is a matter controlled by state law and state policies. We conclude that New Jersey's anti-eviction law protects the surviving resident of this household from eviction without cause, notwithstanding her label as a family-member occupant, provided she can show that she was the functional equivalent of a co-tenant. The record at present suggests that she continuously lived in the apartment for years with the landlord's consent and that her income provided financial support toward the household's satisfaction of the rental obligation. If, in fact, she bore a substantial portion of responsibility for the rental obligation of this tenancy, in which the landlord acknowledged and accepted her residence, then she is a tenant-equivalent and is entitled to the protections of the Anti–Eviction Act.

## I.

Prior to her death in 2005, Bertha Guy resided for approximately thirty years in a New Brunswick apartment owned by Robert Maglies. In 1991, she qualified for a voucher issued through the federal Section 8 program. Maglies entered into a Housing Assistance Payment (HAP) contract with the State Department of Community Affairs, pursuant to which the program paid a portion of the monthly rent directly to Maglies, and Guy paid the remainder. *See* 42 *U.S.C.A.* § 1437f(c)(3); 24 *C.F.R.* §§ 982.311, 982.514 (2007).

In 2001, Guy's adult daughter, Sherri Jennings, moved into her mother's apartment. Jennings has a mental disability for which she receives Social Security benefits. Maglies consented to a new lease agreement that continued to list Guy as the tenant and recognized Jennings only under the designation, "Members of Household." The agreement contained a provision prohibiting anyone other than Guy and Jennings from "resid[ing] in the unit without prior written approval by the owner and the [Housing Authority]." The lease also stated that its initial term was for one year, after which, "the lease term shall renew automatically as follows: The term of this lease will continue [on] indefinite extension until terminated in accordance with this lease and in compliance with New Jersey law."

Concurrently, Maglies [1] also entered into a new HAP contract that, as required under the Section 8 program, took into account Jennings's social security income as contributing to the household's income. *See* 42 *U.S.C.A.* § 1437a(b)(4) (defining "income"); 24 *C.F.R.* § 982.516(e) (2007) (same). The new HAP contract also listed Guy as the tenant and Jennings under the heading of "Household." The HAP contract stated that no other persons could reside in the apartment without written approval. The agreed-upon monthly rent totaled $674, of which the government

---

[1] The persons named in the HAP contract included Guy, Jennings, and Maglies, as well as the State Department of Community Affairs.

paid $441 and the household paid $233.[2] After the initial one-year term of the lease expired on March 31, 2002, and a month-to-month tenancy commenced, Guy and Jennings continued to live in the apartment for three more years.

Guy died on March 30, 2005. Jennings sought and received independent qualification for a Section 8 voucher based solely on her available income. Maglies nevertheless refused to accept the Section 8 voucher and Jennings's contribution to April's rent (which was tendered late) because she was not the named tenant to whom he had rented the apartment. In addition, Maglies asserted other reasons for refusing to accept rent from Jennings. According to Maglies, Jennings, at times, could be a disturbance and he believed that she was not capable of handling the responsibilities expected of a head of household. Maglies also objected to the presence of Jennings's daughter in the apartment after Guy's death. Despite those reservations, Maglies provided Jennings with an application for a new tenancy, which requires the applicant to consent to a credit check. Jennings refused to apply as a new tenant.

When Maglies attempted to lock Guy's apartment, Jennings obtained a restraining order enjoining her removal until an order for possession issued. Accordingly, Maglies initiated a summary dispossess action against the Estate of Bertha Guy based on non-payment of rent. Jennings intervened in the action, claiming that she had a right to possession of the premises and that Maglies could not refuse to accept her rental payments.

Before the trial court, Jennings contended that a surviving family member in a recognized Section 8 household is entitled to continued occupancy after the named tenant's death. Jennings argued that her right to continue in the tenancy did not terminate at her mother's death, that she had a right to possession of the premises, and that she was entitled to the protections of the Anti-

---

[2] The record does not reveal what amount of rent Guy previously had been paying.

Eviction Act. Maglies maintained that the death of a Section 8 tenant does not create a lifetime interest in the property that is transferable to adult family members. Furthermore, he argued that the Anti–Eviction Act does not apply to Jennings because Guy was the only tenant and Jennings did not succeed to her mother's tenancy.

The trial court held that Jennings could remain in possession of the apartment and ordered Maglies to accept rental payments from her. The court stated:

I find that since the lease agreement entered into between the plaintiff and Bertha Guy expired on March [31, 2002,] the relationship between the parties at the time of Ms. Guy's death was a month-to-month tenancy. Ms. Jennings was listed as a member of the household on the HAP contract. Plaintiff was accepting Section 8 subsidies based on her occupancy of the unit. Ms. Jennings had been living in the unit with plaintiff's knowledge and acceptance for over four years.

I therefore find that Ms. Jennings was a bona fide remaining member of the tenant family at the time Ms. Guy died. . . . I find that as a remaining member of the . . . tenant's family Ms. Jennings shall enjoy all occupancy rights to which she was entitled prior to her mother's death, since a remaining family member's occupancy rights are not terminated by the death of any member.

The Appellate Division reversed. *Maglies v. Estate of Guy*, 386 *N.J.Super.* 449, 901 *A.*2d 971 (App.Div.2006). The court's decision began by noting that federal law governing the Section 8 program allows landlords to choose their tenants and contains no authorization for occupants to succeed to the tenancy of another. *Id.* at 454–55, 457, 901 *A.*2d 971. The panel rejected the argument that, as a "remaining member of a tenant family" under 42 *U.S.C.A.* § 1437a(b)(3), Jennings would be entitled to succeed to her mother's tenancy, although the panel noted that she may receive her mother's subsidy voucher. *Id.* at 455–57, 901 *A.*2d 971 (relying on *Carter v. Meadowgreen Assocs.*, 268 *Va.* 215, 597 *S.E.*2d 82 (2004), *cert. denied*, 544 *U.S.* 963, 125 *S.Ct.* 1727, 161 *L.Ed.*2d 606 (2005), as support for distinguishing between right to voucher and right to tenancy). According to the panel, after Guy's death, Maglies was entitled to screen Jennings for creditworthiness and fitness as a tenant in order to determine whether he was willing to enter into a new lease with her as the named tenant. *Id.* at 457, 901 *A.*2d 971 (citing *Franklin Tower One, L.L.C. v. N.M.*, 157 *N.J.*

602, 725 A.2d 1104 (1999); *Pasquince v. Brighton Arms Apts.*, 378 *N.J.Super.* 588, 876 A.2d 834 (App.Div.2005)).

The panel further determined that the protections of New Jersey's Anti–Eviction Act did not apply to Jennings because she was not an assignee, under-tenant, or legal representative of her mother. *Id.* at 460, 901 A.2d 971. Thus, the panel concluded that Jennings could be evicted without cause, but recognized nonetheless that "policy arguments [may] support[ ] the view that the protections of the Anti–Eviction Act should be extended to occupant family members of a deceased tenant in some circumstances." *Id.* at 461, 901 A.2d 971.

We granted Jennings's petition for certification seeking reversal of the Appellate Division's judgment and reinstatement of the trial court's order. 188 *N.J.* 492, 909 A.2d 726 (2006). We also permitted Legal Services of New Jersey and the New Jersey Apartment Association to participate as amici curiae.

## II.

This case presents two issues of first impression for this Court. The parties are at loggerheads over whether either the federal law governing the Section 8 program or the Anti–Eviction Act should prevent Jennings's landlord from successfully evicting her through a summary dispossess action. Because the issues raised herein require the interpretation of law, the lower courts' "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 A.2d 1230 (1995). We consider first whether Section 8 provides the answer to this dispute.

### A. Section 8 Voucher Program

Congress created the Section 8 housing assistance program "[f]or the purpose of aiding low-income families in obtaining a decent place to live." 42 *U.S.C.A.* § 1437f(a); *see also* 24 *C.F.R.* § 982.1 (2007); *Franklin Tower One, L.L.C. v. N.M.,* 157 *N.J.* 602,

608, 725 *A.*2d 1104 (1999). Through the United States Department of Housing and the New Jersey Department of Community Affairs, Division of Housing and Community Resources, eligible families may "select suitable housing," 42 *U.S.C.A.* § 1437f(f)(7), and receive rental assistance for that housing based on the "income of the family." 42 *U.S.C.A.* § 1437f(*o*)(2)(A); *see also* 24 *C.F.R.* §§ 982.1, 982.201 (2007); *Pasquince v. Brighton Arms Apts.,* 378 *N.J.Super.* 588, 591 n. 1, 876 *A.*2d 834 (App.Div.2005). Generally stated, the tenant's contribution toward monthly rent is no more than thirty percent of his or her household income. 42 *U.S.C.A.* §§ 1437f(*o*)(2)(A), 1437f(*o*)(12)(B)(ii); 24 *C.F.R.* §§ 982.1, 982.503(d) (2007). Recertification of a family's income and make-up occurs annually for purposes of determining entitlement to and the amount of the subsidy. 42 *U.S.C.A.* § 1437f(c)(3); 24 *C.F.R.* § 982.516 (2007).

When a landlord enters into a HAP contract with the government for an eligible family, the landlord directly receives Section 8 rental assistance (the subsidy) from the government in an amount equaling the difference between the market rental rate of the premises and the family's contribution, which is derived from the family's income. 42 *U.S.C.A.* §§ 1437f(c)(3), 1437f(*o*)(2)(A), 1437f(*o*)(10)(D); 24 *C.F.R.* § 982.514. As the Appellate Division noted, the HAP contract specifically provides that "the screening and selection of families for [the] units shall be the function of the [landlord]." 42 *U.S.C.A.* § 1437f(*o*)(6)(B); *see also* 24 *C.F.R.* § 982.307 (2007). When screening a prospective renter, a landlord may consider the potential tenant's housekeeping habits and tendency to respect other tenants. *See Franklin Tower One, supra,* 157 *N.J.* at 611, 725 *A.*2d 1104; *see also Pasquince, supra,* 378 *N.J.Super.* at 597, 876 *A.*2d 834 (recognizing that "landlords [also] may take into account the creditworthiness of Section 8 applicants" prior to entering into HAP contract).

The issue here is not quite one of a landlord considering the inception of a rental relationship with a potential Section 8 recipient. Rather, this landlord has consented to the addition of a

financially contributing family member to the Section 8 household already leasing one of his units. The issue is whether a consented-to financially contributing family-member occupant of a Section 8 household has any right to the continued possession of the leased premises after the death of the named tenant. At least two other states' courts have concluded that because the federal law governing the Section 8 program does not answer the question, state law is dispositive of the issue.

In *Morrisania II Associates v. Harvey*, 139 *Misc.*2d 651, 527 *N.Y.S.*2d 954, 956 (Civ.Ct.1988), a New York civil trial court faced with such a circumstance initially framed the question as whether "the Federal section 8 housing assistance law ... preempt[s] or supersede[s] New York landlord-tenant law," and further whether "relatives of section 8 tenants have succession rights regardless of New York law." According to the *Morrisania II* court, "the section 8 program recognizes the entire family as the tenant, entitled to occupancy and assistance," and "encourages family cohesion and the care of the elderly and disabled in the home." *Id.* at 957. The court noted that the Section 8 statute uses the term, "family," and broadly includes in that reference a "remaining member of a tenant family." *Ibid.* (quoting 42 *U.S.C.A.* § 1437a(b)(3)). The court concluded, therefore, that "all family members have occupancy rights which are not terminated by the death of any member." *Ibid.* Having held that "section 8 guarantees continued protection to every legitimate member of the family unit in occupancy," and that "no such family member should suffer eviction, dislocation and homelessness upon the death of the tenant of record," the court ordered a hearing to determine whether the party in issue was a bona fide occupant. *Id.* at 958, 961–62. Subsequently, however, the trial court's analysis was called into question.

Eleven years later, the New York Court of Appeals clarified that "whether [a person] is entitled to continued possession of the premises" is distinct from "whether [a person] is entitled to the continuation of a subsidy." *Evans v. Franco*, 93 *N.Y.*2d 823, 687

*N.Y.S.*2d 615, 710 *N.E.*2d 261, 262 (1999). The Court of Appeals held that the former was governed by state law, while the latter was governed by federal law.[3] *Ibid.* That holding is in keeping with the view of the Supreme Court of Virginia, which similarly determined that the question of a Section 8 household member's continued right to possession of premises upon the death of the named tenant is not a matter of federal law, but rather of state law. *See Carter v. Meadowgreen Assocs.*, 268 *Va.* 215, 597 *S.E.*2d 82, 84 (2004), *cert. denied,* 544 *U.S.* 963, 125 *S.Ct.* 1727, 161 *L.Ed.*2d 606 (2005).

In *Carter,* an occupant son in a Section 8 household asserted that Section 8 allowed him to succeed to the tenancy of his mother because the definition of "families" for purposes of the federal housing assistance program included a "remaining member of a tenant family." *Id.* at 83–84. Rejecting that argument, the Virginia Supreme Court explained that Section 8's "definition of 'families' sets forth the classes of persons intended to be benefited by the statutory scheme." *Id.* at 84. It noted that, with that definition, "Congress did not, however, undertake a total re-writing of state landlord-tenant law as it may apply to 'Section 8 housing.' " *Ibid.* Rather, the court concluded that "where the federal law is silent, the intent of Congress was to leave the applicable state law undisturbed." *Ibid.* (citing three-part test for federal preemption of state law set forth in *Ayers v. Philadelphia Housing Authority,* 908 *F.*2d 1184, 1189 (3d Cir.1990), *cert. denied,* 498 *U.S.* 1103, 111 *S.Ct.* 1003, 112 *L.Ed.*2d 1086 (1991)). The court therefore applied Virginia landlord-tenant law to the controversy. *Ibid.*

---

[3] That said, New York City apparently does provide succession rights to occupants in certain settings. That policy has been held to be not inconsistent with Section 8 law. *See Manhattan Plaza Assoc. v. Dep't of Hous. Pres. & Dev.,* 8 *A.D.*3d 111, 778 *N.Y.S.*2d 164, 164–65 (2004) (finding that New York regulation, "which permits an applicant to establish that he or she is a bona fide family member entitled to succession rights[,] does not frustrate the purpose of Section 8 law, which, by recognizing the entire family as the tenant (*see* 42 *U.S.C.[A.]* § 1437a), seeks to encourage family cohesion").

 Like the decisions of the highest courts in New York and Virginia that came before, we do not read Section 8's broad definition of "families" to compel a state to reject application of the policies and principles of its landlord-tenant law. The program's purpose is to provide funds and a mechanism to facilitate the disbursement of that funding to low-income families in search of housing. *See* 42 *U.S.C.A.* § 1437f(a); 24 *C.F.R.* § 982.1. The Section 8 statute contains no language requiring a state to permit a family household member to succeed to the premises in which he or she resides when that family member is not the named tenant on the lease and HAP contract *and* state law would not provide such protection. The preemption analysis performed by the Virginia Supreme Court persuasively reasoned to the conclusion that the federal statute did not intend to displace state law expectations. *See Carter, supra,* 597 *S.E.*2d at 84. Thus, once a Section 8 tenant and family enter into a lease with a landlord, state law generally determines any issue about a continued right to possession. Accordingly, we must turn to our state law to determine whether Jennings has a right to continued possession of the apartment she shared with her mother.

### B. New Jersey Anti–Eviction Act

 Under New Jersey's common law, upon a tenant's death, the tenancy passes to her estate. *See Gross v. Peskin,* 101 *N.J.Super.* 468, 469, 244 *A.*2d 692 (App.Div.1968). If it was a month-to-month tenancy, as in this case, then the landlord could terminate the lease by giving one month's notice to the estate's legal representatives. *See Ctr. Ave. Realty, Inc. v. Smith,* 264 *N.J.Super.* 344, 350, 624 *A.*2d 996 (App.Div.1993).

 New Jersey's Legislature, however, substantially altered landlord-tenant common law and prior statutory law in respect of residential tenants with the enactment of the Anti–Eviction Act. *See Chase Manhattan Bank v. Josephson,* 135 *N.J.* 209, 219, 638 *A.*2d 1301 (1994) (finding that "[t]he Anti–Eviction Act ... dramatically changed the rights of landlords and owners by prohibit-

ing the ejectment of residential tenants or lessees simply because their tenancies or leases had expired"). The Act states that "[n]o lessee or tenant or the assigns, under-tenants or legal representatives of such lessee or tenant may be removed by the Superior Court ... except upon establishment of one of the following grounds as good cause." *N.J.S.A.* 2A:18–61.1. Seventeen grounds for eviction are enumerated, including nonpayment of rent, destruction of peace and quiet, breach of rules and regulations, breach of covenant, and others. *Ibid.* At this stage of the development of case law surrounding the Act, it is well recognized that "[t]he legislation was designed to protect residential tenants against unfair and arbitrary evictions by limiting the bases for their removal." *447 Assocs. v. Miranda,* 115 *N.J.* 522, 528, 559 *A.*2d 1362 (1989). When a person is protected by the Act, "the effective term of the lease is for as long as the tenant wishes to remain, provided he pays the rent ... and provided there is no other statutory cause for eviction under [the Act]." *Ctr. Ave. Realty, supra,* 264 *N.J.Super.* at 350, 624 *A.*2d 996.

Our Court never before has addressed whether, when the named tenant of a Section 8 household dies, the Anti–Eviction Act's protections extend to a financially contributing household member, who has been in continuous residence in the tenancy with the landlord's acquiescence and consent.[4] The instant case has forced the issue.

---

[4] The issue whether the Act permits the eviction of a surviving family member (but not the named tenant) in a tenancy has been raised, but not squarely confronted, by the Appellate Division, on two prior occasions. In *Center Avenue Realty, supra,* a mother died and left her son as the sole occupant of an apartment that had been rented by the family for over twenty-five years. 264 *N.J.Super.* at 346–47, 624 *A.*2d 996. The son, who also was the executor of her estate, wished to remain in the apartment. *Id.* at 347, 624 *A.*2d 996. The trial court ordered him to vacate and he did. *Ibid.* Because he complied, the Appellate Division determined that "his right to remain in the premises as a successor tenant under the terms of the original lease and subject to removal only under the Anti–Eviction Law ... [was] a moot question that we need not decide." *Ibid.* Rather, the panel found that the Act permitted the son, as executor, some time to remain in possession to wind up the estate. *Id.* at 351–

## III.

As the Appellate Division below recognized, the Anti–Eviction Act does not expressly address whether household members listed on a lease and HAP contract would be included in the broad group of protected persons, including "lessee[s] or tenant[s] or the assigns, under-tenants or legal representatives of such lessee[s] or tenant[s]." *N.J.S.A.* 2A:18–61.1. Maglies relies on the fact that the Act does not explicitly include "occupants" in that list. From that, he reasons that landlords are free to evict, without good cause required, the surviving family member occupant who has lived continuously on the premises with the landlord's consent and identification on the lease and who has contributed to the household's tenancy obligations, aided by a Section 8 voucher.

Although it is true that the Act does not explicitly include occupant family members in the broad group of lessees, tenants, assigns, under-tenants, and legal representatives that may not be evicted without good cause, we are not persuaded that the landlord's self-serving labeling of Jennings as an "occupant" is controlling in this analysis. A label imposed by the landlord cannot and should not control our analysis of the law. The courts of this state long have recognized the need to look beyond labels in order to explore the true character of a transaction or relationship. *See, e.g., Vreeland v. Dawson,* 55 *N.J.Super.* 456, 465, 151 *A.2d* 62 (Ch.Div.1959) (noting rule that courts will "look beyond [a] written instrument and explore the character of [a] transaction"). For

---

52, 624 A.2d 996. The court added, "we leave, however, for another day, the question of the scope of our Anti–Eviction Act *vis-à-vis* occupant family members of deceased tenants." *Id.* at 353, 624 A.2d 996. Similarly, in *Riverview Realty, Inc. v. Williamson,* 284 *N.J.Super.* 566, 570, 665 A.2d 1150 (App.Div.1995), the Appellate Division again left for another day the question whether the Anti–Eviction Act protected resident family members of deceased tenants from eviction. *But see WG Assocs. v. Estate of Roman,* 332 *N.J.Super.* 555, 557, 562, 753 A.2d 1236 (App.Div.2000) (addressing Senior Citizens and Disabled Protected Tenancy Act (SCDPTA), *N.J.S.A.* 2A:18–61.22 to –61.39, and concluding that, under SCDPTA, tenancy terminates upon tenant's death, thereby preventing daughter from remaining in family's rental unit).

example, courts have refused to recognize installment, or "conditional sales," of real property and have called such transactions what they are, namely mortgages with completed conveyances of property, thereby preventing undue advantage from occurring based on a label attached. *See Welsh v. Griffith–Prideaux, Inc.*, 60 *N.J.Super.* 199, 208–09, 158 *A.*2d 529 (App.Div.1960) (discussing seminal case of *J.W. Pierson Co. v. Freeman*, 113 *N.J. Eq.* 268, 270–71, 166 *A.* 121 (E. & A.1933)). The question here is whether Maglies's labeling of Jennings must control her entitlement to the Act's protection, with all the potentially devastating consequences that flow from exclusion from the Act's application. In this instance, where Jennings may be able to show that she was the functional equivalent of a co-tenant, we must turn to settled rules of statutory construction to determine whether the Legislature's use of the term "tenant" should be applied to encompass tenants-in-fact and thereby extend to such individuals the Act's protections.

 This Court has long recognized that

[i]t is an established rule in the exposition of statutes that the intention of the legislature is to be derived from a view of the whole and of every part of the statute, taken and compared together. The real intention, when ascertained, will prevail over the literal sense of terms. When words are not explicit the intention is to be collected from the context and the occasion and necessity of the law and from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant to reason and good discretion.

[*Schierstead v. Brigantine*, 29 *N.J.* 220, 231, 148 *A.*2d 591 (1959) (quoting *May v. Bd. of Comm'rs*, 111 *N.J.L.* 166, 167–68, 168 *A.* 140 (Sup.Ct.1933)).]

Specifically, in respect of the Anti–Eviction Act, we have said that "[i]n establishing tenants' rights to continued occupancy of their rental dwellings[,] the Anti–Eviction Act is remedial legislation deserving of liberal construction." *447 Assocs., supra*, 115 *N.J.* at 529, 559 *A.*2d 1362; *see also* 3 Norman J. Singer, *Sutherland Statutory Construction* § 60:1 at 183 (6th ed. 2001) ("Remedial statutes are liberally construed to suppress the evil and advance the remedy."). Therefore, "[t]he reason and spirit of the statute controls in its interpretations." *Schierstead, supra*, 29 *N.J.* at 231, 148 *A.*2d 591 (citing *May, supra*, 111 *N.J.L.* at 168, 168 *A.*

140); *see also State v. State Troopers Fraternal Ass'n.*, 134 *N.J.* 393, 418, 634 *A.*2d 478 (1993).

In 1974, when the Legislature first enacted the Anti–Eviction Act as a comprehensive bill to revise landlord-tenant laws, it recognized that

> [a]t present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant. As a result, residential tenants frequently have been unfairly and arbitrarily ousted from housing quarters in which they have been comfortable and where they have not caused any problems. This is a serious matter, particularly now that there is a critical shortage of rental housing space in New Jersey. This act shall limit the eviction of tenants by landlords to reasonable grounds and provide that suitable notice shall be given to tenants when an action for eviction is instituted by the landlord.

> [*Introduction Statement to Assembly Bill No. 1586*, at 4 (Apr. 16, 1974), *enacted by L.* 1974, *c.* 49.]

In 1986, the Legislature amended the Anti–Eviction Act and added its findings that

> [i]t is in the public interest of the State to maintain for citizens the *broadest* protections available under State eviction laws to avoid such displacement and resultant loss of affordable housing, which, due to housing's uniqueness as the most costly and difficult to change necessity of life, causes overcrowding, unsafe and unsanitary conditions, blight, burdens on community services, wasted resources, homelessness, emigration from the State and personal hardship, which is particularly severe for vulnerable seniors, the disabled, the frail, minorities, large families and single parents.

> [*N.J.S.A.* 2A:18–61.1a(d) (emphasis added).]

The Legislature thus included "homelessness," and family and social disruption among the ills the Act was designed to prevent. *See Taylor v. Cisneros*, 102 *F.*3d 1334, 1337 (3d Cir.1996) (noting that New Jersey is "quite protective" of residential tenants). The Legislature's statements and findings demonstrate that the Legislature intended the Anti–Eviction Act to protect blameless residential tenants, especially those vulnerable to homelessness, family disruption, and becoming a strain on the community's resources.

The Section 8 program was created "[f]or the purpose of aiding low-income families in obtaining a decent place to live." 42 *U.S.C.A.* § 1437f(a); *see also* 24 *C.F.R.* § 982.1. To qualify for a Section 8 voucher families must be either "very low-income fam-

il[ies]" [5] or "low-income famil[ies]" [6] who meet certain specifications. *See* 42 *U.S.C.A.* § 1437f(*o*)(4); 24 *C.F.R.* § 982.201. A family's income includes "income from all sources of each member of the household." 42 *U.S.C.A.* § 1437a(b)(4); *see also* 24 *C.F.R.* § 982.516(e). For an entire family to be eligible for a Section 8 voucher, each household member must be low income or very low income. As such, each member of a Section 8 household is vulnerable to homelessness and family disruption if he or she cannot obtain affordable housing. It would not be consistent with the Act's purposes to treat differently a surviving Section 8 family member, who may be—in substance if not in form—the functional equivalent of a co-tenant. *See* Singer, *supra*, at 189 ("When there is an ambiguity in a remedial statute, it should be construed to meet the cases which are clearly within the spirit or reason of the law, or within the evil which it was designed to remedy, providing the interpretation is not inconsistent with the language used, resolving all reasonable doubts in favor of applicability of the statute to the particular case.").

▮▮▮ The Act's chief purpose is to keep residential tenants in intact homes and avoid the imposition of personal dislocation so long as the tenancy's financial and other responsibilities are met. Such purposes must be sensibly advanced, particularly when it is an eviction from publicly supported housing that is at stake. Jennings's situation calls for a more fact-sensitive analysis of her rights under the Act. If she indeed presents a circumstance where she was the substantial equivalent of a contributing residential co-tenant in this publicly supported unit, then we hold that the Act will not countenance her eviction merely because her mother passed away, which is the reason that her landlord presently

---

[5] "Very low-income families" are "low-income families whose incomes do not exceed 50 per centum of the median family income for the area." 42 *U.S.C.A.* § 1437a(b)(2); *see also* 24 *C.F.R.* § 5.603 (2007).

[6] "Low-income families" are "those families whose incomes do not exceed 80 per centum of the median income for the area." 42 *U.S.C.A.* § 1437a(b)(2); *see also* 24 *C.F.R.* § 5.603.

advances. Some valid for-cause reason will be required in order to terminate her continued tenancy. In short, in such circumstances she would receive the Act's protections. It certainly would contravene the spirit of the law to interpret the Anti–Eviction Act to protect Jennings from causeless eviction while she lived in a two-member low-income household with her mother, but to subject her to causeless eviction when she became the sole surviving member of a low-income household.

 Our conclusion that a functional co-tenant—one who can show that she has been continuously in residence; that she has been a substantial contributor toward satisfaction of the tenancy's financial obligations; and that her contribution has been acknowledged and acquiesced to by her landlord—is entitled to invoke the protections of the Anti–Eviction Act does not upset the delicate balance of tenants' and landlords' rights. *See N.J.S.A.* 2A:18–61.1a(b) (stating Legislature's finding that State eviction laws were "designated to fairly balance and protect rights of tenants and landlords"). In tendering her rent and seeking recognition that she, in fact, had co-tenant equivalent status, Jennings is placing herself in the position of taking on all of a tenant's reciprocal obligations in this tenancy with Maglies, including responsibility for past arrearages, if any.

Moreover, our decision does not force a landlord to retain someone who otherwise is disqualified from residence in the unit based on, for example, a past conviction or other illegal or impermissible activities (i.e., Megan's Law restriction based on prior sexual offense, or drug dealing). Indeed, in this instance, Maglies was "responsible for screening and selection of the family to occupy [his] unit." 24 *C.F.R.* § 982.307. The "family" he chose included all "person[s] or group[s] of persons ... approved to reside in a unit with assistance under the program." 24 *C.F.R.* § 982.4 (2007). That included Jennings, who has lived in the unit with the landlord's knowledge and express acquiescence for years. That said, we do not harbor any misperception that when a landlord allows in an additional family member, he does so for

purely altruistic purposes. When that occurs, as here, he may have obtained another financially contributing member of the household who strengthens the fiscal health of the family. As a result, he keeps in place a trusted and good tenant, and he becomes essentially more secure in the tenancy as a whole. Notwithstanding the concerns some fear about repercussions from our decision working to the detriment of persons who may seek in the future to become occupants of a family member's leasehold, *post* at 146–47, 936 *A*.2d at 437, we think it unlikely that landlords will respond by prohibiting such family consolidation.

██ Our decision addresses not all occupants but the specific factual circumstances of this Section 8 household in which the daughter apparently brought substantial resources to the family's finances, and whose continuous presence in the leasehold was acknowledged and acquiesced in for years by this landlord. It bears repeating that our conclusion is premised on Jennings's ability to show that she was continuously in residence; that she was a contributor to the financial obligations of the tenancy; and that Maglies knew about her role and acquiesced. Moreover, we note that some lease contracts specifically inform the signatories thereto that the lease will terminate upon the named tenant's death. *See Riverview Realty, Inc., supra,* 284 *N.J.Super.* at 568, 665 *A.*2d 1150 (discussing lease provision calling for lease to terminate "upon the death of the named TENANT within ten (10) days"). Our holding today is not intended to undermine the enforceability of such clauses.

To summarize, we conclude that the Act may protect Jennings from eviction without cause, notwithstanding her "occupant" label. She may be entitled under the Act to continue to live in the apartment and pay her rent in accordance with the continuation of the HAP contract, provided she satisfies her burden of proof on remand. She must develop in the record that she was in continuous residence, that she substantially contributed to the financial obligations of the tenancy that she and her mother enjoyed, and

that Maglies acquiesced in that tenancy arrangement. Based on that showing, the court may determine that she was the functional equivalent of a co-tenant in the Section 8 household she shared with her mother. Nothing in this opinion should be viewed as a commentary on how Jennings's case should turn out. Our point is only that nothing in the Anti–Eviction Act, fairly read, denies her the right to try to show that she was the functional equivalent of a co-tenant.

We further note that, even if Jennings can make such a showing on remand, Maglies would not be foreclosed of the right to evict in accordance with the Anti–Eviction Act, such as for non-payment of rent or for other good cause. Any eviction, however, must be for cause.

## IV.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for further proceedings consistent with this opinion.

JUSTICE HOENS, dissenting.

Today, the majority of this Court holds that an occupant of a leasehold which has terminated, both by operation of law and by the terms of the lease agreement itself, is entitled to the protections of the Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 to –61.12 (the Act). In my view, the majority has failed to adhere to and apply the plain language of the Act; has declined to analyze and appreciate the significance of the applicable legislative history of the Act; and has refused to recognize the impact of the time-honored principles of contract law on which the Act, the related federal statutes and regulations, and the lease itself depend.

In my view, the decision strays far from the obvious intent of the Legislature and has effectively both created life-long possessory rights akin to ownership interests and then extended those rights to a new class of persons who were never intended to be the beneficiaries of the Act. More troubling, however, is that the

majority has created rights so broad and so ill-defined that, in the end, this effort will do more harm than good. I, therefore, dissent.

## I.

Although a complete factual recitation is unnecessary, the dispute before this Court, and the basis for my dissent, can only be understood in light of a few salient facts. As the majority notes, Bertha Guy first became a tenant in a building owned by Maglies in the 1970's. It is unclear whether the terms of the original lease were written or oral, because Guy's tenancy may well have preceded both the adoption of the Act in 1974, and the creation of the Section 8 voucher program, for which Guy first qualified in 1991.

As a result of Guy's successful application for the Section 8 program, Maglies (not Guy) entered into a Housing Assistance Program (HAP) contract with the Department of Community Affairs (DCA), which administers the Section 8 program in New Jersey. At the same time, Maglies and Guy entered into a written lease agreement, using a form lease approved by the U.S. Department of Housing and Urban Development (HUD). Taken together, those two contracts, the HAP contract and the HUD lease, fixed the legal obligations among the three contracting parties, namely, Maglies, DCA, and Guy.

In particular, DCA agreed to pay Maglies a portion of the monthly rent for the unit, based on the difference between its evaluation of Guy's ability to pay and the regular rental amount then charged by Maglies, the landlord. Maglies agreed to accept rent from DCA and from Guy and he also agreed to be bound by the terms of the HUD-approved lease he had entered into with Guy, the tenant. Guy agreed to pay her portion of the rent and to abide by the obligations that the lease imposed upon her.

In 2001, Guy asked Maglies if her daughter Jennings could move into the apartment with her because Jennings needed her help. It is significant that Guy asked Maglies to allow her

daughter to move in because it demonstrates that Guy recognized that she would be in violation of the terms of her lease if Jennings moved in without permission. It is also significant that, as evidence of Maglies's agreement that Jennings could move in, he executed a new lease agreement with Guy. That agreement, however, like every earlier lease agreement, was between Maglies as the landlord and Guy as the sole tenant. The only difference was that the lease in 2001 listed Jennings as a member of the household who was permitted to reside there.

Neither that lease agreement, nor any other document, listed Jennings as a tenant and Jennings never signed a lease or any other agreement. Although the HAP contract, between DCA and Maglies, and the Section 8 voucher amounts, were thereafter adjusted to take into account the income that Jennings had, the rental amount for the apartment regularly payable to Maglies did not change. Guy and Maglies did not sign another lease and when the 2001 lease expired, the relationship became a month-to-month tenancy by operation of law.

The record reflects that Guy died on March 30, 2005, which was one day before the end of the lease term. When Guy died, Jennings did not become the executrix or administratrix of her estate. That role was filled by Rafhidah Ali, who is not a party to these proceedings. After Guy's death, Maglies refused to accept rent from Jennings and declined to execute a new HAP contract that would have named her as the tenant, rather than as a family member permitted to reside in the apartment as an occupant under Guy's HAP contract.

During the pendency of these proceedings, Jennings has continued to remain in the apartment, without having signed a lease and, therefore, without ever being bound to the terms of any contract ordinarily required of any other tenant. Moreover, because Jennings is in need of assistance from another adult to remain in any apartment, her adult daughter has moved into the apartment as well. It does not appear that Jennings asked Maglies for permission for her daughter to reside in the apartment with her. As a

result, Jennings's daughter's status, as it relates to the lease, is neither as a tenant, nor as a permitted family member, nor as an authorized occupant.

## II.

The majority recognizes that federal law and the rules governing Section 8 do not create tenancy rights, *see ante* at 120, 936 *A.2d* at 420–21. The majority, quite correctly, then turns to an analysis of state law principles for guidance as to the rights, if any, that are afforded to Jennings following the death of Guy. *Ibid.* Where I part company with the majority, however, is in the analysis of the Act and its intent concerning the rights, if any, of a surviving family member, and in the further issue of whether the Act, if it is silent, permits us to cloak Jennings with the rights that the Act accords specifically to tenants. In order to determine whether Jennings, at the time of her mother's death, became a tenant or otherwise fell within the protections of the Act, I turn to an analysis of legislative intent based on the plain language and the legislative history which, in my view, is absent from the majority's decision.

## A.

I begin, then, with a consideration of the Act as the touchstone for my analysis. As in all of our efforts to interpret legislative intent, we begin with the words chosen by the Legislature itself, for if the language is plain and its meaning is clear, we are bound to interpret it and apply it as written. *See, e.g., Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565–66, 924 *A.2d* 1193 (2007); *Thomsen v. Mercer–Charles,* 187 *N.J.* 197, 206, 901 *A.2d* 303 (2006); *Merlino v. Borough of Midland Park,* 172 *N.J.* 1, 9, 796 *A.2d* 203 (2002). If, on the other hand, the language is ambiguous or lends itself to more than one interpretation, the Court may look to secondary sources to aid in the interpretation of the Legislature's intent. *See, e.g., Daidone, supra,* 191 *N.J.* at 565–66, 924 *A.2d* 1193; *Ramapo River Reserve Homeowners Ass'n v. Borough*

*of Oakland,* 186 *N.J.* 439, 450, 896 *A.*2d 459 (2006); *Cherry Hill Manor Assocs. v. Faugno,* 182 *N.J.* 64, 75, 861 *A.*2d 123 (2004).

Applying these basic principles to the issue before this Court leaves no room for debate. The Act itself, in plain and unambiguous words, specifies those to whom its protections extend. That language is not broadly stated, but instead provides as follows: "[n]o *lessee or tenant or the assigns, under-tenants or legal representatives of such lessee or tenant* may be removed ... from any house, building ... or tenement leased for residential purposes ... except upon establishment of one of the following grounds as good cause...." *N.J.S.A.* 2A:18–61.1 (emphasis added). The Act, therefore, by its terms, applies only to one who is a lessee; a tenant; or an assign, under-tenant or legal representative of a lessee or tenant.

It is noteworthy that the Legislature did not define those terms as a part of the Act. Each, however, is a technical term well understood in our law and we must conclude that the Legislature intended to use these terms in their technical sense. *See N.J.S.A.* 1:1–1 ("Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning."). Jennings does not meet the definitions for any of these terms, and neither she nor the majority suggests to the contrary. Utilizing a plain language analysis, therefore, Jennings is not entitled to any of the protections of the Act that apply to a tenant.

Notwithstanding that insurmountable obstacle to relief, Jennings argues that her status as an "occupant" or "surviving family member" entitles her to claim the benefit of the Act's protections. This cannot be, however, because the Act itself includes references to occupants and family members, each of which is a status relevant for some other purpose but which, tellingly, the Legislature has not added within the language defining those to whom the Act's protections extend.

For example, the Act grants certain of its protections to "disabled family members" who reside in units owned by other family members, *see N.J.S.A.* 2A:18–61.1, thereby explicitly expanding the Act's protective scope to these individuals in certain defined circumstances.

On the other hand, the Act makes reference to occupants and to family members in several sections that explicitly give the landlord the right to evict, but never extends protection to these groups. For example, a tenant whose behavior, "continue[s] to be, after written notice to cease, so disorderly as to destroy the peace and quiet of *the occupants* or other tenants living in said house or neighborhood" may be evicted under the Act. *N.J.S.A.* 2A:18–61.1b (emphasis added). Moreover, the Act also permits eviction of a tenant who "knowingly harbors" a person who has committed a drug offense, a theft, an assault, or made a terroristic threat against the landlord or a member of his *"family,"* or a tenant who "permits or permitted such a person to *occupy* those premises for residential purposes...." *N.J.S.A.* 2A:18–61.1n to –61.1q (emphasis added).

In each of these examples, the Legislature carefully distinguished the status of tenant from that of occupant or family member. In doing so, the Legislature demonstrated that it was cognizant of the separate meanings of the terms, the significance of which is inescapable. By its careful use of terms, the Legislature can only have meant to extend protection only to those it precisely named. Therefore, consistent with our ordinary plain language analysis, because Jennings is not a tenant, a lessee, or an assign, under-tenant or legal representative of a tenant or lessee, she simply cannot claim the benefit of the Act's protective reach.

### B.

Overlooking the fact that this result must follow from a plain language analysis, the majority relies on the argument that the Act is "remedial legislation," *see 447 Assocs. v. Miranda,* 115 *N.J.* 522, 529, 559 *A.*2d 1362 (1989), as the basis for its expansive

reading of the Act's intended scope. Nothing in the remedial purposes of the Act, however, supports the broad reading of the term "tenant" that the majority today embraces. Instead, to the extent that the concept of "tenant" was discussed at all, the Act adhered to the term's traditional definition. Faithfulness to the Act's intent, then, would dictate that we likewise utilize the well-understood meaning of the technical terms the Legislature has chosen.

Moreover, merely invoking the "remedial" mantra is insufficient to support the majority's analysis. In fact, while relying on that label, the majority fails to recognize the significant legislative history bearing on the question of what it was, in actuality, that the Legislature intended to remedy when enacting this statute. That analysis demonstrates that the majority's assumption that the Act can be used to create broad remedies beyond its stated scope is unfounded.

It is unquestionably true that the Act was intended to afford broad protections to tenants. But it is also true that the Act created a simple and efficient means for a landlord to evict a tenant where the landlord was privileged to do so. During the extensive hearings that led to the passage of the Act, numerous witnesses attested to problems facing both tenants and landlords because of the virtual absence of laws governing the rights of either. An analysis of the concerns that led to the Act's passage demonstrates that the Act was designed to remedy more than simply the rights of tenants.

There is no doubt that, prior to the Act's passage, tenants were largely without any rights. At the same time, in particular in our urban centers, housing was very scarce. New residential units were not being built and existing housing stock was falling into disrepair. *See* George Charles Bruno, New Jersey Landlord–Tenant Law: Proposals for Reform, 1 *Rutgers–Cam. L.J.* 299, 304 n. 26 (1969). As a result, tenants were subjected to rent-gouging, deplorable living conditions, and summary eviction, including eviction through self-help mechanisms. *Id.* at 302–05.

In 1969, the crisis affecting rental housing in New Jersey prompted the Assembly to pass a resolution creating the New Jersey Landlord–Tenant Relations Study Commission (the Commission). *See* Assemb. Con. Res. 28 (1969). The Commission was charged with studying laws affecting tenants with an eye toward recommending changes to those laws as needed. *See Public Hearing Pursuant to Assemb. Con. Res. 28 Before the New Jersey Landlord–Tenant Relationship Study Commission,* vol. 1, 1 (1969) (statement of William Goldberg, Chairman, N.J. Landlord–Tenant Relationship Study Comm'n) [hereinafter *Commission Hearings* ].

In a series of hearings in November and December 1969, the Commission heard testimony from a variety of witnesses, including scholars, economists, attorneys and tenants' rights advocates. Some of those witnesses pointed out that there were no statutes governing landlord-tenant relations, with the effect that, in large measure, only common law principles were operative. *See id.* at 43–44 (testimony of Prof. Gerald Gibbons). Those principles afforded landlords significant rights, including distraint, a form of extra-judicial self-help permitting landlords to seize the tenant's possessions in lieu of rent, and the power of a landlord to take possession of a leasehold and summarily evict a tenant in default without notice. *Id.* at 43–45; *see, e.g., Callen v. Sherman's, Inc.,* 92 *N.J.* 114, 120, 455 *A.*2d 1102 (1983) ("Distraint of a tenant's goods by a landlord may be the sole surviving relic of the early common law's tolerance of self-help." (citing *Commercial Credit Co. of Baltimore v. Vineis,* 98 *N.J.L.* 376, 120 *A.* 417 (Sup.Ct. 1923))). Indeed, the sole statute that had been enacted prior to 1969 protected landlords by giving them the right to evict a tenant summarily for cause, or on a few days' notice for no cause, but gave no rights to the tenants whatsoever. *See Commission Hearings, supra,* at vol. 4, 71–73 (testimony of Fred Schmidt, Attorney, Camden Reg'l Legal Servs.) (explaining *N.J.S.A.* 2A:18-51).

At the same time, the common law afforded tenants no rights and few tenants had written leases to protect them against either summary eviction or onerous and arbitrary increases in rent. This imbalance resulted in a number of abuses. Some tenants' rights advocates reported that tenants were being forced to live in deteriorating premises at high rents because the common law gave them no protections and because the housing shortage meant that they had nowhere else to go. *Id.* at vol. 4, 10–14 (testimony of Dr. John Morrow, Chairman, Colony House Tenants Assoc.).

In urging the Commission to address this imbalance, tenants' rights advocates presented a variety of proposals during the hearings. These suggestions included calls for the creation of a right of tenants to pursue a rent strike or for recognition of an implied covenant of habitability, *id.* at vol. 4, 31–32 (testimony of Peter Siegel, Director, Middlesex County Legal Servs.); arguments in favor of statutory protections for tenants, including recognizing the right of a tenant to demand a written lease, *see id.* at vol. 4, 111–13 (testimony of William Colantuono, Forest Hills Tenants Comm.); advocating for enactment of a statute requiring the state-wide use of a uniform lease, *id.* at vol. 2, 101 (testimony of Kellogg G. Birdseye); or imposition of a limit on the number of times in a year that a landlord would be allowed to raise the rent, *id.* at vol. 4, 116 (testimony of Dennis Deverin).

In 1970, the Commission presented its interim report to the Governor and Legislature. *N.J. Landlord–Tenant Relationship Study Commission, Interim Report to the Governor and Legislature* (1970) [hereinafter *Interim Report*]. The *Interim Report* identified "[f]lagrant abuses by some landlords, which have exacerbated existing tensions includ[ing]: insistence upon oppressive leases; refusal to tender written leases; issuance of notices to quit without cause; refusal to permit subleasing; unlawful distraint for rent; self-help evictions; inadequate or absence of notice in summary proceedings for possession; retaliatory evictions; excessive rental increases; inadequate maintenance, failure to return security deposits and other comparable conduct." *Id.* at 2–3.

The *Interim Report,* however, was hardly one-sided, pointing out that not all of the problems in landlord-tenant relations could be blamed on landlords. Rather, during the hearings the Commission had also uncovered "a phalanx of tenant abuses, the most notable of which are lease-breaking, indiscriminate destruction of property, rule-breaking, vandalism and rent skips, retaliation in the form of rent strikes and other concerted action (often in response to legitimate and justifiable rent increases)." *Id.* at 3.

As part of the *Interim Report,* the Commission recommended that then-existing statutory protections for tenants against retaliatory evictions, *see N.J.S.A.* 2A:170–92.1, be amended to provide protections for organized activity by tenants, that the self-help remedies available to landlords be abolished, and that the jurisdictional limit of the small claims court be raised to a level sufficient to make that forum available for tenants seeking return of security deposits. *Interim Report, supra,* at 7–8. The Commission also proposed changes to give landlords greater ability to secure financing for improvements that would reduce landlords' reliance on rents and thus ease the housing crisis. *Id.* at 8. Finally, the Commission proposed an ambitious agenda of further work in its effort to address the continuing problems of landlord-tenant relations. *Id.* at 5–6, 41.

The bill that eventually became the Act was included among nearly a dozen bills jointly considered in 1974. During hearings on these bills, witnesses echoed the continuing concern about the severe housing crisis, the lack of sufficient protections for tenants and need for substantial reform. Tenants' rights organizations called for legislation that would entitle tenants to the protections that a written lease agreement would afford as a solution "to the crucial problem of the privilege given a landlord to arbitrarily evict a tenant." *Public Hearing on Assembly Bills 58, 232, 284, 940, 943, 946, 947, 951, 953, 954, 1048 and 1060 (Landlord–Tenant) Before the Assemb. Commerce, Industry & Professions Comm.,* 39 (1974) [hereinafter *1974 Hearings*] (testimony of Sylvia Aranow, President, N.J. Tenants Org.); *see also id.* at 51 (testimony of

Eileen Martini, Legis. Counsel to the Mayor of Jersey City) ("[T]here are many aspects of the landlord-tenant relationship that are in further need of legislation, including and most particularly the right of a landlord to evict a tenant with no reason being given.").

Not all of the witnesses supported the proposed bills. Some witnesses condemned all of them as being "blatantly anti-property owner" and an unnecessary overreaction to a few bad landlords. *See Public Hearing on Assembly Bill Nos. 54, 151, 152, 160, 165, 212, 1071, 1072, 1535, 1536, 1557, 1610, 2122, and Senate Bill No. 429 Before the Assemb. Revision & Amendment of Laws Comm.,* 6 (1973) [hereinafter *1973 Hearings* ] (testimony of Albert Rubin, N.J. Assoc. of Realtor Bds.). Those witnesses asked the Legislature not to so alter the balance in favor of tenants' rights that the housing crisis would be further exacerbated through wide-spread decisions by existing landlords to convert properties to non-residential uses. *See ibid.* Other witnesses cautioned against creating avenues for abuse by tenants who might want to avoid signing renewal leases but who would be able to continue in possession without any right of the landlord to evict. *1974 Hearings, supra,* at 4 (testimony of Sam Herzog, Apartment House Council). They warned that some of the language might place "the tenant . . . virtually in a position to confiscate the unit." *Ibid.* Those witnesses also urged the Legislature to expand the grounds on which a landlord would be permitted to evict a tenant, so as to recognize additional "[v]alid and totally reasonable causes for removal. . . ." *Ibid.*

Significantly, although granting broad protections for tenants, the Act that was eventually passed also included many of the proposed additional grounds for eviction urged by the landlords. *See* Assemb. No. 1586, *L.* 1974, *c.* 49 (1974) (enacted). In the end, the Act protects both tenants and landlords and creates a careful balance between the rights and remedies available to each. *See ibid.* Simply referring to the Act, as the majority does, as "remedial" without recognizing that the Legislature sought to

remedy abuses of both landlords and tenants, in my view, threatens to upset the Legislature's carefully struck balance.

## C.

In enacting this broad protective legislation, the Legislature did not define, or even consider, the terms that are central to the dispute now before us. Throughout the lengthy series of hearings that gave rise to the eventual passage of this Act, witness after witness simply referred to tenants and to landlords, all in apparent agreement as to what these commonly-understood terms mean. Indeed, the only reference to how one might define a lessee or a tenant can be found in a brief statement concerning the language about the scope of the Act's coverage. One of the staff attorneys for Newark Legal Services testified as follows:

> [T]here is a legal distinction ... a lessee is a party who has made a contract with a lessor, namely, a landlord, to rent premises. A lessee becomes a tenant when he takes occupancy of the premises. So every tenant is a lessee, whether it is through a written or oral lease, but every lessee is not a tenant. A tenant, we thought, refers to someone who is in occupation of premises through a lease agreement. But a lessee doesn't have to be in occupation.
>
> [*1974 Hearings, supra,* at 74A (testimony of Phillip Steinfeld, Staff Attorney, Newark Legal Servs.).]

Not only is this the sole reference to the meaning of the terms tenant and lessee, it is also the only mention of the intended scope of the protections afforded by the terms of the Act.

Although the Act, as originally adopted, did not include specific legislative findings supporting a liberal construction, the Act's purposes were described in the Sponsor's statement:

> At present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant. As a result, residential tenants frequently have been unfairly and arbitrarily ousted from housing quarters in which they have been comfortable and where they have not caused any problems. This is a serious matter, particularly now that there is a critical shortage of rental housing space in New Jersey. This act shall limit the eviction of tenants by landlords to reasonable grounds and provide that suitable notice shall be given to tenants when an action for eviction is instituted by the landlord.
>
> [Assemb. No. 1586, *L.* 1974, *c.* 49, *supra,* Sponsor's statement.]

More recently, in adopting the 1986 amendments to the Act, the Legislature added a series of specific findings that reiterated the Act's essential purpose, finding as follows:

It is in the public interest of the State to maintain for citizens the broadest protections available under State eviction laws to avoid such displacement and resultant loss of affordable housing, which, due to housing's uniqueness as the most costly and difficult to change necessity of life, causes overcrowding, unsafe and unsanitary conditions, blight, burdens on community services, wasted resources, homelessness, emigration from the State and personal hardship, which is particularly severe for vulnerable seniors, the disabled, the frail, minorities, large families and single parents.

[*N.J.S.A.* 2A:18–61.1a.]

Although the amendments in 1986 were designed to address displacements of tenants caused by conversion of rental units to condominiums and the like, the continuing expression of concern for tenants and their rights is not without significance. However broad the Act's language, however serious the problems that led to its passage, and however wide its embrace of tenants and their rights may be, the Act's essential focus is and has been from the outset, on tenants. That focus, to the exclusion of any mention of rights of "occupants" or "surviving family members" is telling.

As broad as one's view of the remedial purposes of the Act may be, nothing in the legislative history overcomes the impact of the plain language and nothing suggests that the Legislature intended that the Act's scope would be expanded beyond its carefully selected terms. On the contrary, the legislative history suggests that Jennings falls outside of the Act's protections. To the extent that the Legislature considered the definitions of the categories relevant to this dispute, the language it chose affords Jennings no relief.

### III.

I dissent for a further reason, based on concepts central to the Section 8 program itself. As the majority notes, the Section 8 program only provides a funding source for tenants who meet its eligibility criteria based on rental amounts for units in which they reside. *See* 42 *U.S.C.A.* § 1437f(c); 24 *C.F.R.* § 982.514. The Section 8 program neither creates nor affects leasehold rights, which are governed solely by operation of state law. *See ante* at

118–20, 936 *A.*2d at 420–21 (citing and discussing *Carter v. Mea-dowgreen Assocs.,* 268 *Va.* 215, 597 *S.E.*2d 82, 84 (2004), *cert. denied,* 544 *U.S.* 963, 125 *S.Ct.* 1727, 161 *L.Ed.*2d 606 (2005), and *Evans v. Franco,* 93 *N.Y.*2d 823, 687 *N.Y.S.*2d 615, 710 *N.E.*2d 261, 262 (1999)).

What the majority overlooks, however, is plain language in the federally mandated lease and in the applicable regulations that prohibits the creation of rights in favor of anyone other than a tenant. More to the point, the terms and provisions that embody those prohibitions are obvious to Section 8 participants. All HAP contracts require the landlord, at least initially, to enter into a written lease with the tenant that lists the members of the household or family. Each such lease must include and incorporate the terms of a HUD-approved form called the Section 8 Addendum. U.S. Dep't of Housing and Urban Dev., Form HUD–52641–A, *Tenancy Addendum* (2007) [hereinafter *Addendum*]. The *Addendum* not only sets forth numerous rights and responsibilities of tenants and landlords participating in the Section 8 program, many of which mirror various provisions of our landlord-tenant law, but it also includes other terms relevant to this dispute.

Significantly, the *Addendum* defines each of these critical terms and incorporates, as a result, the following definitions into each lease:

**Family.** The persons who may reside in the unit with assistance under the program.

. . . .

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide.

. . . .

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

. . . .

**Tenant.** The family member (or members) who leases the unit from the owner. [*Addendum, supra,* at 4–5, ¶ 17.]

Therefore, by virtue of the inclusion of the *Addendum,* each lease by its terms draws a sharp distinction between a tenant, who

is a signatory to the lease, and members of the family or household who merely are permitted to reside in the leased premises. Likewise, the HAP contract between the DCA and a landlord, echoes this language. *See* U.S. Dep't of Housing and Urban Dev., Form HUD–52641, *Housing Assistance Payments Contract* (2007) at 5, ¶ 12. Although the HAP contract refers to "the family" for purposes of defining permissible occupants and persons covered by the payment of Section 8 funds, *see id.* at 7, ¶¶ 3, 5, it also contains the *Addendum's* definitions of "family" and "household" that are separate from and not dependent on the definition, or status, of "tenant," *see id.* at 10, ¶ 17.

Furthermore, the federal regulations governing the Section 8 program specifically provide that nothing in the HAP agreement confers any third-party beneficiary status on a family member as it relates to the lease contract. *See* 24 *C.F.R.* § 982.456. Instead, the applicable regulation provides as follows:

> (b)(1) The family is not a party to or third party beneficiary of the HAP contract. Except as provided in paragraph (b)(2) of this section, the family may not exercise any right or remedy against the owner under the HAP contract.
>
> . . . .
>
> (c) The HAP contract shall not be construed as creating any right of the family or other third party (other than HUD) to enforce any provision of the HAP contract, or to assert any claim against HUD, the PHA or the owner under the HAP contract.
>
> [*Id.* § 982.456(b)(1), (c).]

Taken together, these provisions emphasize the sharp distinction drawn between rights enjoyed by tenants and the lesser status of family members or permissible occupants. Nowhere in the federal regulations or federally-mandated agreements is there a suggestion that a family member has the rights reserved by statute and contract to a tenant. On the contrary, cloaking Jennings with those rights creates precisely the sort of third-party beneficiary status that the federal program expressly forbids.

## IV.

I reach a result different from the majority in this matter for yet another reason, quite separate and apart from this analysis of

legislative intent and federal mandates. Regardless of one's interpretation of the Act and the federal mandates, the fact remains that a lease is a contract and its terms are governed by contract principles. Those well-settled principles include several that, in my view, are relevant.

Central to our ordinary rules of contract construction is our faithful adherence to the principle that we enforce contracts in accordance with their terms. We do not supply terms to contracts that are plain and unambiguous, nor do we make a better contract for either of the parties than the one which the parties themselves have created. *See Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960) ("Courts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made."); *Graziano v. Grant*, 326 *N.J.Super.* 328, 342, 741 *A.*2d 156 (App.Div.1999) ("[I]t is not the function of the court to make a better contract for the parties, or to supply terms that have not been agreed upon.") Therefore, if the contract into which the parties have entered is clear, then it must be enforced by this Court without regard to whether we would have made a different agreement had we been asked.

The contract in this matter is indeed clear. The lease is a specific form of contract because of the inclusion of the *Addendum* and because of the overlay of the Act's protective scope. The combination of those factors creates a possessory interest in the premises which is akin to a life estate. That life estate runs in favor of the tenant who is a signatory to the lease and operates only as long as the tenant does not violate any of the covenants in the lease or the requirements of the Act. However, a life estate is just that, and it terminates at the end of the protected life. It does not pass through an estate nor by operation of law. The majority's reasoning, however, would extend that life estate to a family member, creating a virtual interest in fee in the property owned in fee by another. Taken to its logical extension, it would never end. I see no basis in the law for such a result.

Attempting to apply contract principles to this dispute points out another shortcoming in the analysis of the majority, because at the time of Guy's death, Jennings was not a party to any contract. She was not a signatory to the lease or to the HAP contract. Although it is true that her income was utilized for purposes of calculating the amount of the Section 8 subsidy that the tenant's household would receive, that calculation did not alter the amount of rent that Maglies received and certainly did not make Jennings a party to any contract. Rather, in 2001, when Guy asked Maglies for permission to allow her daughter Jennings to live with her in the apartment, she became, by operation of law, a member of that household whose income was relevant for Section 8 calculations.

More to the point, the very fact that Guy recognized that she needed permission for Jennings to reside in the apartment demonstrates that Guy knew the consequences of letting her daughter live there without her landlord's permission. Simply put, this lease, between Guy and Maglies, like all residential leases, creates reciprocal legal obligations between the landlord and the tenant. Among those is the agreement that the tenant is prohibited from allowing others to occupy the unit unless specified on the lease as tenants, as occupants, or, in the case of a Section 8 contract, as members of the household. Listing Jennings on the lease did not create a legal relationship between Jennings and the landlord; rather, it only prevented Maglies from evicting Guy for permitting one not authorized by the lease to occupy the residence.

The record suggests that when Guy asked Maglies for permission to let Jennings live in the apartment, she also asked him to add Jennings to the lease as a tenant, which he refused to do. Guy surely knew the significance of the difference in status between a tenant, who has a right to enforce the lease and a right to claim the benefits of the protections of the Act, and a member of the household, an occupant, or a family member, who has no such rights.

Guy had no right to demand that Jennings be listed as a tenant, and Maglies, at the time, had no obligation to enter into a

contractual relationship with her. And the record also reflects that after Guy's death, and in connection with a separate Section 8 application, Jennings demanded that Maglies sign a new lease with her, which demand he refused because he believed that she is simply not an appropriate credit risk. Nothing in the Act suggests that Maglies, by agreeing to allow Jennings to occupy the premises while Guy was the tenant, gave up his right to refuse to extend the status of tenant to Jennings for reasons that would permit him to decline to rent to anyone else.

In effect, the majority decision extends a unilateral option to a tenant's co-habitating family members. The landlord receives no reciprocal obligations or other consideration in exchange for that option, but he is now required to "hold open" the tenancy to a tenant's surviving family. Those family members, who have given up nothing for the right to this option, are of course unbound and free to either accept the opportunity and assume the tenancy or simply walk away.

This result was not intended or foreseeable to Guy or Maglies at the time they entered into the lease contract. Indeed, this situation could not have been foreseen because Maglies rejected Guy's lesser request to add Jennings as a tenant, who, under that circumstance, would then at least bear return obligations to Maglies. By giving Jennings the right to assume and enforce the lease, the majority breaks new ground by vesting third-party contractual rights in an unintended beneficiary. *Contra N.J.S.A.* 2A:15–2 ("A person for whose benefit a contract is made . . . may sue thereon in any court. . . ."); *Broadway Maint. Corp. v. Rutgers, the State University,* 90 *N.J.* 253, 259, 447 *A.*2d 906 (1982) ("The contractual intent to recognize a right to performance in the third person is the key. If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing.").

## V.

The question for me, then, is what support is there for the majority's decision today? Stripped to its bare essentials, the

majority has created a new status, found nowhere in the Act or in the contract and, apparently, never before contemplated by any landlord or tenant. The majority does so by making what I perceive to be two fundamental analytical errors. First, the majority confuses the unprotected, permissive status of occupant with the protected status accorded to a tenant, doing so in contravention of the clear terms of the lease and in violation of the Act and the federal regulations relating to third-party family members who occupy the space. Second, the majority misperceives the requirement of Section 8 that any family member who has an income must contribute to the rent so as to reduce the available housing subsidy, equating that obligation with a legal relationship between that person and the landlord, even though the *Addendum* itself precludes that result.

By using these two flawed bases for its analysis, the majority creates a new status, variously described as a "tenant-equivalent," *ante* at 112, 936 *A.*2d at 416, a "surviving family member occupant who has lived continuously on the premises with the landlord's consent and identification on the lease and who has contributed to the household's tenancy obligations, aided by a Section 8 voucher," *ante* at 122, 936 *A.*2d at 422, a person who "may be able to show that she was the functional equivalent of a co-tenant," *ante* at 123, 936 *A.*2d at 422, "a surviving Section 8 family member, who may be—in substance if not in form—the functional equivalent of a co-tenant," *ante* at 125, 936 *A.*2d at 424, and "the substantial equivalent of a contributing residential co-tenant," *ante* at 125, 936 *A.*2d at 424.

Apart from those descriptions, the status the majority creates to clothe Jennings with all of the protections that the Act reserves to tenants is not defined. Indeed, the lack of definition as to who other than Jennings qualifies for the full protections of the Act creates a broad new category that, it would appear, includes every occupant and family member listed on every lease. At the same time, the majority dismissively refers to Maglies' entirely lawful and contractually accurate description of Jennings as an occupant

as "self-serving labeling" which is not, in their view, "controlling." *Ante* at 122, 936 *A*.2d at 422.

Little more can be said. In an apparent effort to aid Jennings, who in the end is no different from thousands of other family members of tenants, the majority today vests in all persons living in rental units who are not themselves signatories to any lease agreement, who are merely permissive occupants, and who have no legal obligations whatsoever to the owners of those premises, the fullest protections of the Act. In the end, the breadth of that analysis will operate to the detriment of tenants far more than it will impact on landlords.

Because the majority has potentially elevated every occupant to the status of tenant, in the future landlords may feel compelled to reject any tenant who proposes to reside in premises with others who would not be independently suitable as tenants. Thus, the spouse with a bad credit history, the family member with a prior minor criminal offense, the elderly mother-in-law, and thousands of others in similar circumstances will, as a practical matter, disqualify an otherwise acceptable tenant from being able to enter into a lease contract. Landlords will look with new eyes at those least able to bargain for themselves and their families, rejecting potential tenants for entirely permissible reasons and without recourse. Sadly, the result may well be exactly the ones that the Act's framers sought so hard to avoid—increasing the shortage of available rental housing, particularly in urban centers, heightening the reluctance of landlords to rent to tenants with large families, and fueling the choice by residential landlords to remove properties from the available stock of housing entirely.

Because the majority's analysis is flawed, because the status the majority today creates is found nowhere in the Act, in the contract, or in ordinary principles that have governed landlord-tenant relationships for decades, because that flawed analysis stands every previously well-settled contractual relationship involving tenancies on its head, and because the breadth of the majority's ruling is limitless, I dissent.

Justice ALBIN joins in this opinion.

*For reversal and remandment*—Justices LONG, LaVECCHIA, WALLACE and RIVERA–SOTO—4.

*For affirmance*—Justices ALBIN and HOENS—2.