16 A.3d 300

TOWN OF KEARNY, PLAINTIFF–RESPONDENT, v. DISCOUNT CITY OF OLD BRIDGE, INC., SPARTECH POLYCOM, FRANKLIN PLASTICS CORP., DEFENDANTS, AND DVL KEARNY HOLDINGS, LLC, DEFENDANT–RESPONDENT, AND JAMES FARM MARKET CORP. AND JAMES WHOLESALE WAREHOUSE, INC., DEFENDANTS–APPELLANTS.

Argued September 28, 2010—Decided March 17, 2011.

LaVecchia, J., filed a dissenting opinion, in which Rivera–Soto and Stern (temporarily assigned), JJ., joined.

390

*Edward Sun Kiel* argued the cause for appellants (*Cole, Schotz, Meisel, Forman & Leonard,* attorneys).

*Gregory J. Castano, Jr.,* argued the cause for respondent Town of Kearny (*Castano Quigley,* attorneys).

*James G. O'Donohue* argued the cause for respondent DVL Kearny Holdings, LLC (*Hill Wallack,* attorneys; *Mr. O'Donohue* and *L. Stephen Pastor,* on the briefs).

Justice LONG delivered the opinion of the Court.

The issues on this appeal include the following: whether one who is not the record owner of property when a redevelopment designation is being considered under the Local Redevelopment and Housing Law (LRHL), *N.J.S.A.* 40A:12A–1 to –73, may later challenge a blight designation in an eminent domain proceeding;

whether a leasehold interest, standing alone, can be condemned; and, if so, whether the condemning authority has a statutory obligation under *N.J.S.A.* 20:3–6 of the Eminent Domain Act of 1971 (Eminent Domain Act), *N.J.S.A.* 20:3–1 to –50, to conduct bona fide negotiations with the lessee. A discrete issue regarding the effect of a lease condemnation provision on the relationship between landlord and tenant, where the landlord is also serving as the redeveloper, is also presented.

We reaffirm our decision in *Iron Mountain Information Management, Inc. v. City of Newark*, 202 *N.J.* 74, 995 *A.*2d 841 (2010), that a non-record owner of property is not entitled to individualized notice that redevelopment is being considered but only to newspaper publication under *N.J.S.A.* 40A:12A–6(b)(3) and that if that party does not object or challenge the blight designation at the hearing or in a timely action in lieu of prerogative writs, the issue is foreclosed. *Id.* at 78–79, 995 *A.*2d 841. We further hold that a leasehold interest is an "interest in land" that, standing alone, can be condemned. In that instance, the lessee has the same rights as any other condemnee, including the right to bona fide negotiations. In this case, the lease between the lessor, who was also serving as the redeveloper, and the lessee contained a common condemnation clause which did not relieve the municipality from the duty to negotiate with and compensate the lessee. Because bona fide negotiations did not occur here, the condemnation complaint must be dismissed.

## I.

DVL, Inc. (DVL) is a Delaware corporation which wholly owns Professional Service Corp. (PSC), DVL Kearny Holdings, LLC (DVL Kearny Holdings), and Del Toch LLC (Del Toch).[1] Like the parties, we refer to those entities collectively as DVL. Del Toch owns Del Toch Industrial Park (Del Toch property) and the

---

[1] PSC and Del Toch are organized under Delaware law. DVL Kearny Holdings is a New Jersey limited liability corporation.

adjacent eight acres in Kearny. The Del Toch property is leased to: (1) Discount City of Old Bridge, Inc. (Discount City); (2) James Farm Market Corporation; and (3) James Wholesale Warehouse, Inc. (collectively "James"). Franklin–Burlington Plastics, Inc., d/b/a Spartech Polycom (Spartech) possessed a reservoir easement on the Del Toch property.[2]

James's leasehold interest, 3.8% of the Del Toch property, is based on two lease agreements with PSC dated July 21, 1994, and March 31, 1995. The leases describe the "complex" as Toch Industrial Park, 160 Passaic Avenue, Kearny, New Jersey, and the "premises" as 5,544 square feet located in Building 12 of the complex and 7,873 square feet located in Building 113 of the complex. Apparently, the renewal options in the leases were exercised such that James remained a tenant of DVL at all times relevant to this action. Each lease contains the following clause:

CONDEMNATION: If the Complex of which the Premises are a part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation, or if in lieu of any formal condemnation proceedings or actions, Landlord shall grant an option to purchase and or shall sell and convey the Premises or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land or any portion thereof, then this lease, at the option of the Landlord, shall terminate, and the term hereof shall end as of such date as Landlord shall fix by notice in writing; and Tenant shall have no claim or be entitled to any portion of any amount which may be awarded as damages or paid as the result of such condemnation proceedings or paid as the purchase price for such option, sale or conveyance in lieu of formal condemnation proceedings; and all rights of the Tenant to damages, if any, are hereby assigned to the Landlord. The Tenant agrees to execute and deliver any instruments, at the expense of the Landlord, as may be deemed necessary or required to expedite any condemnation proceedings or to effectuate a proper transfer of title to such public authority, seeking to take or acquire the Premises or any portion thereof. Tenant covenants and agrees to vacate the Premises, remove all the Tenant's personal property and deliver up peaceable possession thereof to Landlord, or to such other party designated by Landlord in the aforementioned notice. Failure by Tenant to comply with any provisions in this clause shall subject Tenant to such costs, expenses, damages and losses as Landlord may incur by reason of Tenant's breach hereof.

---

[2] Discount City and Spartech are not parties to this action.

On January 11, 2000, the Mayor and Council of the Town of Kearny (collectively "Kearny") authorized and directed the Planning Board to conduct a redevelopment study of the Passaic Avenue area. In relation to the Del Toch property, the report stated:

Parcels 51 and 52, Del Toch Industrial Park and Ozzie's Ford display obsolete layout of structures and obsolescence of buildings and improvements that has resulted in a not fully productive condition of land. The industrial park has reused existing structures, however these structures and the parking and circulation of the site have not been changed since their construction in the first half of the 20th Century to accommodate the new uses. Obsolete tanks remain on-site, and defunct motor vehicles are stored on-site. The subdivided lot that contains Ozzie's Ford has been haphazardly drawn and does not provide comprehensive circulation and access for that property. The 5- and 6-story buildings on both properties exceed the 40' height limit for the C-4 zoning district.

Following the study, the Planning Board issued notices for the purpose of hearing persons who were interested in or would be affected by a determination that the delineated area was a redevelopment area, as required by *N.J.S.A.* 40A:12A–6(b)(2). In doing so, it complied with all of the provisions pertaining to publication and mailing of those notices as required by *N.J.S.A.* 40A:12A–6(b)(3). The Planning Board conducted hearings on October 2 and October 16, 2000, at which time all persons who requested to be heard were permitted to do so as required by *N.J.S.A.* 40A:12A–6(b)(4). After completing its hearing on the matter, the Planning Board, in accordance with *N.J.S.A.* 40A:12A–6(b)(5), recommended that Area B on the Planning Board map be a redevelopment area. That area included the Del Toch property.

On December 12, 2000, in response to that study, Kearny designated the Passaic Avenue area, including the Del Toch property, "as in need of redevelopment." Following that designation, Heyer, Gruel, & Associates, P.A., submitted a proposed redevelopment plan which was subsequently adopted by Kearny through an ordinance on October 11, 2001:

This Redevelopment Plan authorizes the Town to exercise its condemnation powers on all properties in the Redevelopment Area, to acquire property or to eliminate any restrictive covenants, easements or similar property interests which may undermine the implementation of the Plan.

The Town plans, however, to continue working with affected property owners and businesses to promote private redevelopment, where appropriate, of the parcels within the Redevelopment Area.

On December 6, 2001, Osborne Capital and Delborne Land Company, along with DVL, through Del Toch, all owners of Passaic Avenue properties, filed a complaint in lieu of prerogative writs against Kearny and the Planning Board seeking, *inter alia,* to invalidate the "blight designation" and the Passaic Avenue redevelopment plan as to their properties.

On October 8, 2002, Kearny designated the Forest City Ratner Companies as the redeveloper. The plaintiffs in the prerogative writs action then filed an amended complaint which added a count challenging the designation of Forest City Ratner as redeveloper. By judgment dated November 21, 2003, that matter was dismissed with prejudice, except for the inverse condemnation claims which were dismissed without prejudice.

In April 2004, the Forest City Ratner agreement lapsed and was not renewed. Shortly thereafter, Kearny issued a request for proposals for redevelopers for the Passaic Avenue project. On October 16, 2006, DVL Kearny Holdings was designated as conditional redeveloper for the portion of the Passaic Avenue project that includes the Del Toch property. On December 11, 2007, Kearny entered into a redeveloper agreement with DVL Kearny Holdings. James was not notified by Kearny or DVL of those proceedings.

In accordance with the agreement, Kearny acknowledged that DVL owned the vast majority of the redevelopment zone, including the Del Toch property, and pledged to acquire the remaining parcel. In relation to acquiring the leaseholds within the Del Toch property, the December 2007 redeveloper agreement stated:

With regard to the Del Toch Parcels, [DVL] is requesting that the Town use its eminent domain powers, at the sole cost and expense of [DVL], to acquire the property interest identified [in Exhibit E]. The Town agrees to use reasonable efforts, at the cost and expense of [DVL], to acquire these interests.

Exhibit E identified James's leases as "property interests to be acquired by condemnation." The agreement also stated that DVL

"shall pay all out-of-pocket costs incurred by the Town arising out of the voluntary acquisition of the Property and/or any condemnation action. . . ." In other words, Kearny would condemn whatever was needed for the project and DVL would pay just compensation on its behalf. Finally, Exhibit E affirmed that DVL "shall first be required to use its best efforts to terminate the said leases [with James] through negotiation and by making reasonable relocation offers."

Upon being named as conditional redeveloper, DVL began negotiating the termination of the James leases and relocation options. DVL offered James $250,000, even though it claims that the estimated cost of relocation was only $50,000. James declined the offer, raising concerns about DVL's appointment as redeveloper without any prior communication with its tenants, and countered with an offer for $3 million. No further negotiations occurred. At no time was Kearny involved in any separate negotiations with James.

On May 8, 2008, a condemnation action against James was initiated by Kearny.[3] On July 29, 2008, the trial court entered an order in favor of Kearny declaring that Kearny "duly exercised its power of eminent domain;" and, therefore, "[a]ll tenancies . . . [were] terminated."

James appealed and the Appellate Division affirmed in part, and reversed and remanded in part. First, the panel held that Kearny had the authority to condemn James's leasehold as a separate property interest, apart from DVL's fee simple ownership interest. Second, the panel declared that DVL had met its obligation under the redeveloper agreement to " 'use its best efforts to terminate' " James's leases and that the bona fide negotiations requirement was met. Third, the panel held James, as a tenant, had no right to individual notice during Kearny's exploration and eventual approval of the "blighted" area designation and was, therefore,

[3] Kearny reached a private agreement with Discount City and Spartech and those two defendants were immediately dismissed without prejudice.

bound by the forty-five-day limit for challenging a proposed blight designation, which it did not satisfy. *See N.J.S.A.* 40A:12A–6(b)(4), (7); *R.* 4:69–6. Finally, the panel held James waived its earlier claims that DVL breached its contractual "obligation of good faith and fair dealing under the lease," because it did not raise the issue in its brief on appeal. However, the panel remanded the issue of whether James had a right to just compensation and relocation expenses.

On remand, the trial court held that the words "any portion thereof" in the condemnation clause governed the taking of James's leasehold interest and in addition stated:

> At oral argument, counsel for [James] conceded that, if the Town had filed or in the future did file a complaint in condemnation, it would be able to acquire DVL's fee interest in the property and at the same time extinguish [James's] tenancy. Presumably, it would do this after requiring DVL to deposit sufficient money with the Town to fund a deposit into court, by filing a Declaration of Taking, by then allowing DVL to withdraw the money on deposit and then by transferring title from the Town back to DVL as redeveloper. In such a hypothetical condemnation action, [James] concedes that its entitlement, if any, to the proceeds of the condemnation action would be determined by the language of the condemnation clauses in its leases with DVL. [James] further conceded that, in such a hypothetical, it would only be entitled to relocation fees and would have no claim on any proceeds of the condemnation action.
>
> The result should not be different simply because this was a so-called "friendly" condemnation which accomplished the same result as the hypothetical above would without the need for unnecessary litigation. The agreement between DVL and [James] should not be rewritten simply because, instead of litigated condemnation between the Town and DVL, a friendly condemnation takes place in furtherance of the Town's redevelopment plan. The fact of the friendly condemnation and the designation of DVL as the redeveloper should not place [James] in a better position than it contractually put itself in when it first entered into the lease agreements.

Judgment was entered in favor of Kearny, disallowing all compensation to James, and dismissing the complaint with prejudice and costs. We granted James's petition for certification, *Town of Kearny v. Discount City of Old Bridge, Inc.,* 201 *N.J.* 439, 991 *A.*2d 229 (2010), and now reverse.

## II.

Globally, James argues that Kearny has deprived it of its property without due process of law and just compensation. In

particular, it contends that it did not know about the plan to redevelop the Del Toch property and should now have an opportunity to challenge the blight designation; that DVL did not negotiate in good faith and thus did not satisfy Kearny's statutory obligations; and, as a result of all of those things, the condemnation complaint should be dismissed.[4] Alternatively, James contends that it has a right to just compensation.

DVL counters that Kearny has the power to condemn any interest in land; only the fee simple owner has a right to notice of the blight designation; negotiations are only required with the record title holder of the property; and the lease between James and DVL controls Kearny's obligation to compensate James and eliminates any need for it. Kearny essentially supports the arguments of DVL.

### III.

■ The concept of eminent domain dates back to the Magna Carta. *Harrison Redevelopment Agency v. DeRose,* 398 *N.J.Super.* 361, 391, 942 *A.*2d 59 (App.Div.2008). It is deeply rooted in our own jurisprudence, having first been declared in the 1776 New Jersey Constitution. *Ibid.* (citing *N.J. Const. of 1776* ¶ 22). In contour, the doctrine recognizes "the rightful authority which exists in every sovereignty to control rights of a public nature which pertain to its citizens in common and to appropriate and control property for the public benefit as the public safety, necessity, convenience, or welfare may demand." *Valentine v. Lamont,* 13 *N.J.* 569, 575, 100 *A.*2d 668 (1953).

Because eminent domain involves the taking of private property, it "has always been subject to constitutional and statutory limits." *DeRose, supra,* 398 *N.J.Super.* at 391, 942 *A.*2d 59. The Eminent Domain Clause of our constitution provides: "Private property

---

[4] At every stage of proceedings below, James argued that the Eminent Domain Act does not authorize condemnation of leases apart from the fee simple interest. It abandoned that claim in its petition for certification.

shall not be taken for public use without just compensation. Individuals or private corporations shall not be authorized to take private property for public use without just compensation first made to the owners." *N.J. Const.* art. I, ¶ 20.

Specific to "blighted" property,[5] the Blighted Areas Clause of our constitution declares:

> The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and improvements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time.... The conditions of use, ownership, management and control of such improvements shall be regulated by law.
>
> [*N.J. Const.* art. VIII, § 3, ¶ 1.]

Pursuant to that provision, a municipality seeking to remedy blight may exercise its eminent domain power so long as it adheres to the Eminent Domain Clause and any applicable statutory requirements. *See Gallenthin Realty Dev., Inc. v. Borough of Paulsboro,* 191 *N.J.* 344, 359, 924 *A.*2d 447 (2007) (noting "clause operates as both a grant and limit on the State's redevelopment authority").

The statutory requirements governing blight and redevelopment are embodied in the LRHL which was enacted to "revise[ ], consolidate[ ] and clarif[y] the various statutes related to the exercise of redevelopment and housing powers by local governments into a modern and comprehensive statute." Assemb. 1138 (Assembly Housing Committee), 205th Leg., 1992 *N.J. ALS* 79 (N.J.1992). The Act "empowers municipalities to designate property as 'in need of redevelopment'" if the property meets any one of the eight subsections of *N.J.S.A.* 40A:12A–5. *Gallenthin, supra,* 191 *N.J.* at 357, 366, 924 *A.*2d 447. In enacting the LRHL, the Legislature recognized that

---

[5] The term "blighted" is synonymous with the phrase "in need of development." *DeRose, supra,* 398 *N.J.Super.* at 394, 942 *A.*2d 59.

There exist, have existed and persist in various communities of this State conditions of deterioration in housing, commercial and industrial installations, public services and facilities and other physical components and supports of community life, and improper, or lack of proper, development which result from forces which are amenable to correction and amelioration by concerted effort of responsible public bodies, and without this public effort are not likely to be corrected or ameliorated by private effort.

[*N.J.S.A.* 40A:12A–2(a).]

In addition,

[a]n area determined to be in need of redevelopment pursuant to this section shall be deemed to be a "blighted area" for the purposes of Article VIII, Section III, paragraph 1 of the Constitution. If an area is determined to be a redevelopment area and a redevelopment plan is adopted for that area in accordance with the provisions of this act, the municipality is authorized to utilize all those powers provided in [*N.J.S.A.* 40A:12A–8].

[*N.J.S.A.* 40A:12A–6(c).]

That scheme allows a municipality to "[a]cquire, by condemnation, any land or building which is necessary for the redevelopment project, pursuant to the provision of the 'Eminent Domain Act of 1971.'" *N.J.S.A.* 40A:12A–8(c). "This means that the government's acquisition of property in the redevelopment area shall be treated as a legitimate 'public purpose' for purposes of constitutional takings law." *DeRose, supra,* 398 *N.J.Super.* at 396–97, 942 A.2d 59 (citing *Vineland Constr. Co. v. Twp. of Pennsauken,* 395 *N.J.Super.* 230, 250, 928 A.2d 856 (App.Div.2007), *appeal dismissed as moot,* 195 *N.J.* 513, 950 A.2d 902 (2008)).

A blighted area must be more than one that is "not used in an optimal manner" or "not fully productive." *Gallenthin, supra,* 191 *N.J.* at 365, 367, 373, 924 A.2d 447. Further, recognizing the reality that within a blighted area there may be some parcels that are being optimally used, "non-blighted parcels may be included in a redevelopment plan if necessary for rehabilitation of a larger blighted area...." *Id.* at 372, 924 A.2d 447; *see also N.J.S.A.* 40A:12A–3 ("A redevelopment area may include lands, buildings, or improvements which of themselves are not detrimental to the public health, safety or welfare, but the inclusion of which is found necessary, with or without change in their condi-

tion, for the effective redevelopment of the area of which they are a part.").

Under the LRHL, a municipality has the power to:

(1) Cause a preliminary investigation to be made ... as to whether an area is in need of redevelopment;

(2) Determine ... that an area is in need of redevelopment; [and]

(3) Adopt a redevelopment plan....

[*N.J.S.A.* 40A:12A–4(a).]

To implement those powers, a municipality may "authorize the planning board to undertake a preliminary investigation to determine whether the proposed area is a redevelopment area according to the criteria set forth [*N.J.S.A.* 40A:12A–5]." *N.J.S.A.* 40A:12A–6(a). One step in that process is a public proceeding, upon notice, "for the purpose of hearing persons who are interested in or would be affected by a determination that the delineated area is a redevelopment area." *N.J.S.A.* 40A:12A–6(b)(2).

During the proceedings, the planning board must "hear all persons who are interested in or would be affected by a determination that the delineated area is a redevelopment area." *N.J.S.A.* 40A:12A–6(b)(4). Objections may be made orally or in writing. *N.J.S.A.* 40A:12A–6(b)(4). Thereafter, the board must report to the governing body whether the area, or any part of it, should be designated for redevelopment. *N.J.S.A.* 40A:12A–6(b)(5). If the board recommends redevelopment, the governing body must notify anyone who filed a written objection to the designation, *N.J.S.A.* 40A:12A–6(b)(5), and must wait forty-five days before it takes further action, *N.J.S.A.* 40A:12A–6(b)(6).

Once the process is complete, the governing body may, pursuant to *N.J.S.A.* 40A:12A–7, adopt a redevelopment plan for the area. *N.J.S.A.* 40A:12A–6(c). Notice of the plan's adoption is not required. If the redevelopment plan is adopted, the governing body may use any of the powers listed in *N.J.S.A.* 40A:12A–8 to implement the plan. *N.J.S.A.* 40A:12A–6(c). Among them is the power to condemn the property and take it by eminent domain. *N.J.S.A.* 40A:12A–8(c). In addition, the governing body may

designate a redeveloper who is permitted to exercise eminent domain powers on its behalf. *N.J.S.A.* 20:3–33. That is the backdrop for our inquiry.

## IV.

At oral argument, James conceded that at the time the initial notices were issued pursuant to *N.J.S.A.* 40A:12A–6(b)(3), it was not entitled to individual notice because it was not a record owner. It contends, however, that now that it is the sole condemnee it should have the right to challenge the blight determination. We turn to the language of the LRHL which provides the specific notice requirements for the public hearing:

> A copy of the notice shall be published in a newspaper of general circulation in the municipality once each week for two consecutive weeks, and the last publication shall be not less than ten days prior to the date set for the hearing. A copy of the notice shall be mailed at least ten days prior to the date set for the hearing to the *last owner, if any, of each parcel of property within the area according to the assessment records of the municipality.* A notice shall also be sent to all persons at their last known address, if any, whose names are noted on the assessment records as claimants of an interest in any such parcel.
>
> [*N.J.S.A.* 40A:12A–6(b)(3) (emphasis added).]

As is evident from the words of the statute, the Legislature differentiated between the classes of persons entitled to general notice and those warranting specific notice. By that scheme, "the Legislature intended, in the blight designation context, to limit the right to actual notice to owners of record and those whose [names] are listed on the tax assessor's records...." *Iron Mountain, supra,* 202 *N.J.* at 78, 995 *A.*2d 841 (citation and internal quotation marks omitted). As the Appellate Division opinion that we affirmed in *Iron Mountain* explained:

> when the Legislature adopted the LRHL, it chose not to impose upon a governing body any obligation to provide commercial tenants with individual notice of a proposed blight designation. In fact, the LRHL treats commercial tenants no differently from any other member of the general public whose only notice of the proposed blight designation is publication of a hearing notice in a newspaper....
>
> [*Iron Mountain Info. Mgmt., Inc. v. City of Newark,* 405 *N.J.Super.* 599, 604, 966 *A.*2d 62 (App.Div.2009), *aff'd,* 202 *N.J.* 74, 995 *A.*2d 841 (2010).]

Thus, DVL, the record owner of the Del Toch property, had a right to individual notice of Kearny's effort to declare the property in need of development. James, on the other hand, like any member of the public, had a right to notice by way of newspaper publication and could have appeared or entered a written objection to the designation. If it had filed a written objection, the governing body would have notified it when the designation was approved. *N.J.S.A.* 40A:12A–6(b)(5). James likewise could have filed an action in lieu of prerogative writs under *Rule* 4:69–6(a) within forty-five days of Kearny's formal designation of the Del Toch property as in need of development, an action it did not undertake.

Contrary to James's contention, this is not a case like *DeRose,* which involved a property owner entitled to specific notice under the LRHL. There, the trial court held that the owner lost his ability to challenge the sufficiency of the notice and the blight designation because he failed to file an action in lieu of prerogative writs within the forty-five-day period. *DeRose, supra,* 398 *N.J.Super.* at 385, 942 *A.*2d 59. However, the record revealed that the owner was not provided with fair and adequate notice that the municipality was targeting his property for redevelopment, or that the town could take his property if it was declared in need of redevelopment. *Id.* at 416, 942 *A.*2d 59. In those circumstances the Appellate Division ruled that, for constitutional purposes, the property owner's right to contest a blight determination in an ensuing condemnation action was preserved. *Id.* at 421, 942 *A.*2d 59.

That is not what occurred here. Here, James had appropriate statutory notice of the proposed redevelopment of its landlord's property through newspaper publication. Indeed, there is no claim that that notice was in any way legally or factually deficient as in *DeRose.* As a signatory to a lease that declared that it would terminate if the landlord's property was condemned, James was well aware of the effect that Kearny's redevelopment initiative could have on it. James was thus bound to participate in the

hearings and, if unsuccessful, to challenge the blight designation in an action in lieu of prerogative writs. Having failed to avail itself of those remedies, it is now foreclosed from pursuing the issue, despite the fact that it is now the sole condemnee.

## V.

All parties now agree that Kearny is empowered to condemn a leasehold interest, separate and apart from, and without the condemnation of, the fee simple. That notion is rooted in the very language of *N.J.S.A.* 20:3–20 which provides:

> The title to property condemned and acquired by the condemnor hereunder, shall be a title in fee simple, free and discharged of all right, title, interest and liens of all condemnees, and shall include all the right, title and interest of each condemnee therein, provided, *however, that if the complaint or any amendment thereof shall specify a lesser title, the lesser title so specified shall be the title condemned and acquired.*
>
> [ (Emphasis added).]

That legislative language anticipates a situation in which a leasehold or an easement is the only condemned property interest. That interpretation gels with the language the Legislature used to define "real property" and "property" in the LRHL and the Eminent Domain Act which cross-reference each other and require cognate interpretations. *DeRose, supra,* 398 *N.J.Super.* at 409–11, 942 *A.*2d 59. Both contemplate leasehold interests as an independent subcategory. Indeed, the LRHL defines "real property" as: *"all lands, including* improvements and fixtures thereon, and property of any nature appurtenant thereto or used in connection therewith, and *every* estate, *interest and right, legal or equitable, therein, including terms for years* and liens by way of judgment, mortgage or otherwise, and indebtedness secured by such liens." *N.J.S.A.* 40A:12A–3 (emphasis added).

Likewise, the Eminent Domain Act defines "property" as "land, *or any interest in land* . . . ." *N.J.S.A.* 20:3–2(d) (emphasis added); *see Valentine, supra,* 13 *N.J.* at 578, 100 *A.*2d 668 ("[W]here the public use so requires the Legislature may authorize the taking of a fee or any less estate."); *see also County of Sussex v. Merrill*

*Lynch Pierce Fenner & Smith, Inc.,* 351 *N.J.Super.* 66, 69, 796 *A.*2d 958 (App.Div.2001) (affirming trial court conclusion that: "conceptually, there is absolutely no doubt that the power of a governmental entity to condemn interests in property extends to the interest of a tenant in property."). In short, like the courts below, we are satisfied that a municipality has the right to condemn a leasehold interest. *See Orsett/Columbia L.P. v. Superior Ct.,* 207 *Ariz.* 130, 83 *P.*3d 608, 613 (App.2004) (comparing Arizona condemnation statute with *N.J.S.A.* 20:3-2(d) noting New Jersey allows condemnation of less than fee). That right, however, bears with it concomitant responsibilities.

## VI.

Because of the constitutional implications of the taking of private property for a public purpose, a municipality seeking to do so must pay "just compensation" to every condemnee with a compensable interest. *Gallenthin, supra,* 191 *N.J.* at 356, 924 *A.*2d 447. In order to achieve a compensation figure that is just, the Legislature has directed public entities to engage in bona fide negotiations with condemnees. *N.J.S.A.* 20:3-6. Just compensation is intended to place the condemnee "in as good a position monetarily as [it] ... would have occupied had the property not been taken...." *Casino Reinvestment Dev. Auth. v. Katz,* 334 *N.J.Super.* 473, 484, 759 *A.*2d 1247 (Law Div.2000). If the government does not conduct the requisite negotiations, the condemnation complaint will be dismissed. *County of Monmouth v. Whispering Woods at Bamm Hollow, Inc.,* 222 *N.J.Super.* 1, 10, 535 *A.*2d 968 (App.Div.1987), *certif. denied,* 110 *N.J.* 175, 540 *A.*2d 173 (1988); *Borough of Rockaway v. Donofrio,* 186 *N.J.Super.* 344, 353-54, 452 *A.*2d 694 (App.Div.1982), *certif. denied,* 95 *N.J.* 183, 470 *A.*2d 409 (1983).

In terms of the scope of the negotiations, New Jersey follows the "unit rule," appraising in condemnation, not each constituent interest, but the total bundle of rights making up the

fee. *See State v. N.J. Zinc Co.*, 40 *N.J.* 560, 573–74, 193 *A.*2d 244 (1963). The rationale behind the unit rule is

[s]ince the one award as a whole is the equivalent of the total compensation to which all of those having relative interests in the property are adjudged to be entitled, justice dictates that the owner of each individual interest should receive from the award a proper divisional share of indemnity for his particular deprivation and loss, if any.

[*New Jersey Highway Auth. v. J. & F. Holding Co.*, 40 *N.J.Super.* 309, 315, 123 *A.*2d 25 (App.Div.1956).]

Under that scheme, allocation to the holders of individual interests follows the overall award.

■ As a result, as DVL properly points out, ordinarily a municipality is not required to undertake the burden of negotiating with each and every interest holder in private property. *City of Atlantic City v. Cynwyd Invs.*, 148 *N.J.* 55, 70–71, 689 *A.*2d 712 (1997). Indeed, we have held that where a fee simple is being condemned, negotiations will take place with the fee owner alone: "[t]he rights of all other condemnees with a compensable interest are better protected by allowing them to participate later during the Commissioner's hearing, where value is determined, *N.J.S.A.* 20:3–12, and during the still subsequent proceeding when the compensation is allocated." *Ibid.* (citing *N.J.S.A.* 20:3–34; *R.* 4:73–9).

■ It is that procedure on which DVL relies to support its notion that there was no obligation on the part of Kearny to negotiate with James in the first instance because James is not a fee owner. That is a misreading of the relevant principle. To say that where the fee simple is being condemned, the fee owner's negotiations encompass inferior interests is quite different from suggesting that where the fee is not involved, a lesser interest being condemned is not entitled to negotiations at all. To the contrary, it is obvious that where the fee is not at issue, the holder of the interest that is actually at stake is the party with whom negotiations must take place. Otherwise, no party would be charged with "protecting" the lesser interest. *DeRose, supra,* 398 *N.J.Super.* at 402, 942 *A.*2d 59.

Here, the fee simple was neither the subject of condemnation nor of an agreement in lieu thereof. Indeed, no action, formal or friendly, by or on behalf of Kearny to obtain ownership of DVL's fee interest in the Del Toch property was ever undertaken. DVL's right to its own property remains inviolate. The only interest that was ever at stake was that of James which was, therefore, the party entitled to bona fide negotiations.

## VII.

That brings us to the issue of whether DVL, in fact, lived up to its obligation to engage in bona fide negotiations with James. In exercising that power, DVL assumed Kearny's responsibility to be forthright and fair, which obligation applies

> with equal force where government designates a private developer to negotiate an acquisition. Once a proper declaration of blight is made, the governing body may, by resolution, agree that a private or public enterprise, or a combination of both, be chosen to undertake the redevelopment project pursuant to a comprehensive plan either created or approved by it.... However, when [the redeveloper] stepped into [the municipality]'s shoes to perform those functions which [the municipality] would have otherwise performed itself, [the redeveloper] became the vehicle of the [municipality] through which the public purpose was to be accomplished, pursuant to the terms of the redevelopment agreement. [The redeveloper] must be held to the same or similar standards as that of the condemning authority. While it would be expected to seek to profit from the development, it was not free to speculate for its own account in property interests which were part of the very property it was allowed to acquire.
>
> [*Jersey City Redevelopment Agency v. Costello*, 252 *N.J.Super.* 247, 257–58, 599 *A.*2d 899 (App.Div.) (citations omitted), *certif. denied*, 126 *N.J.* 332, 598 *A.*2d 890 (1991).]

The question then becomes whether the offer and rejection conversations that occurred between James and DVL constituted bona fide negotiations. The Eminent Domain Act does not define what is necessary to make a negotiation bona fide. *State by Comm'r of Trans. v. Carroll*, 123 *N.J.* 308, 315–16, 587 *A.*2d 260 (1991). It does, however, require

> an offer in writing by the condemnor to the prospective condemnee ... setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such

offered compensation has been calculated, and such other matters as may be required by the rules.

[*N.J.S.A.* 20:3–6.]

Above all else, those obligations must "be construed and applied in a manner protective of property owners." *Carroll, supra,* 123 *N.J.* at 316, 587 *A.*2d 260.

To ensure that the condemnee receives "just compensation," this Court has approved the "one-price" offer method. *Id.* at 318, 587 *A.*2d 260.

[This] procedure is meant to protect landowners negotiating with the State. The objective of requiring an initial full-price offer is to prevent the State from making low offers to gain a bargaining advantage, forcing owners into adversarial positions in order to secure the full market values of their properties. The one-price procedure assures that the property owner will obtain no less than the State's genuine determination of the fair market value of the property taken. That salutary policy and common sense understanding are confirmed by the widespread use of one-price offers in condemnations by the federal government and other states. Indeed, the whole thrust of the eminent-domain process is that the State should operate differently from an open-market, arms-length buyer.

[*Id.* at 318–19, 587 *A.*2d 260 (citations omitted); *see also Katz, supra,* 334 *N.J.Super.* at 484, 759 *A.*2d 1247 (continuing to adhere to requirement that State make best offer up front and then may continue negotiating).]

With a one-price offer, the condemnor must identify any appraisals used and disclose the valuation methodology it employed. *Carroll, supra,* 123 *N.J.* at 323, 587 *A.*2d 260. Failure to supply the appraisals and explain how the offered compensation was calculated is fatal. *Whispering Woods, supra,* 222 *N.J.Super.* at 9, 535 *A.*2d 968; *County of Morris v. Weiner,* 222 *N.J.Super.* 560, 564–65, 537 *A.*2d 752 (App.Div.), *certif. denied,* 111 *N.J.* 573, 546 *A.*2d 501 (1988); *County of Morris v. 8 Court St. Ltd.,* 223 *N.J.Super.* 35, 37, 537 *A.*2d 1325 (App.Div.), *certif. denied,* 111 *N.J.* 572, 546 *A.*2d 500 (1988).

Here, DVL made a one-price offer to James. However, according to its correspondence with James, DVL's offer was solely for relocation. As we have noted, DVL claims that the relocation costs were only $50,000. Thus, the nature of the remaining $200,000 offer is unclear. If it was just for relocation, DVL failed in its obligation to negotiate regarding the underlying value of the lease.

Contrariwise, if the $200,000 was actually an offer regarding the value of the lease, it too failed because it was not accompanied by appraisals or an explanation of the valuation method. Without that information, James could not make an informed decision. *See Carroll, supra,* 123 *N.J.* at 319, 587 *A.*2d 260. Either way, DVL did not engage in bona fide negotiations with James.

The Appellate Division's contrary conclusion was wide of the mark. Plainly the redeveloper agreement which required DVL to "use its best efforts to terminate [James's leases] through negotiation and by making reasonable relocation offers" could not relieve DVL of its obligation, on behalf of Kearny, under *N.J.S.A.* 20:3–6.

## VIII.

Because DVL contends that the condemnation clause in its lease with James relieves it and Kearny of any obligation to James, we turn again to the lease which provides, in relevant part:

CONDEMNATION: If the Complex of which the Premises are a part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation, or if in lieu of any formal condemnation proceedings or actions, Landlord shall grant an option to purchase and or shall sell and convey the Premises or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land or any portion thereof, then this lease, at the option of the Landlord, shall terminate, and the term hereof shall end as of such date as Landlord shall fix by notice in writing; and Tenant shall have no claim or be entitled to any portion of any amount which may be awarded as damages or paid as the result of such condemnation proceedings or paid as the purchase price for such option, sale or conveyance in lieu of formal condemnation proceedings; and all rights of the Tenant to damages, if any, are hereby assigned to the Landlord. The Tenant agrees to execute and deliver any instruments, at the expense of the Landlord, as may be deemed necessary or required to expedite any condemnation proceedings or to effectuate a proper transfer of title to such public authority, seeking to take or acquire the Premises or any portion thereof. Tenant covenants and agrees to vacate the Premises, remove all the Tenant's personal property and deliver up peaceable possession thereof to Landlord, or to such other party designated by Landlord in the aforementioned notice. Failure by Tenant to comply with any provisions in this clause shall subject Tenant to such costs, expenses, damages and losses as Landlord may incur by reason of Tenant's breach hereof.

That language is the subject of dueling interpretations by DVL and James. DVL argues that Kearny's condemnation of James's leasehold interest satisfies the clause trigger—that "any portion" of its premises be taken under eminent domain. As a result, DVL contends that James's lease terminated and that James was not entitled to any amount "which may be awarded as damages" in the condemnation. James counters that the lease is not "a portion of the premises" and that DVL is not accurately assessing the condemnation clause which is completely irrelevant because it does not operate at all in the absence of a taking of all or part of the underlying fee interest.

## A.

In resolving that conflict, we begin with the truism that the lease is a contract between DVL and James which sets forth their rights and obligations to each other in connection with DVL's temporary grant of possession of its property to James. *Maglies v. Estate of Guy,* 193 *N.J.* 108, 143, 936 *A.*2d 414 (2007); 7A *Nichols on Eminent Domain* § 11.01[1][a] (3d ed.1999) (a lease is a contract that creates contract rights and obligations). Our function in interpreting a contract is to give meaning to the symbols of expression chosen by the parties. *Schnakenberg v. Gibraltar Sav. & Loan Ass'n,* 37 *N.J.Super.* 150, 155, 117 *A.*2d 191 (App.Div.1955); 5 *Corbin on Contracts* § 24.21 (Joseph M. Perillo ed.1998). In doing so, we look to the words used by the drafters which we interpret, not in isolation, but as a whole, in order to ascertain their meaning. *Schnakenberg, supra,* 37 *N.J.Super.* at 155, 117 *A.*2d 191. An important weight in the calculus is the purpose the parties sought to attain by the inclusion of the controverted clause. *Ibid.; see also Restatement (Second) of Contracts* § 202(1) (1981) ("[I]f the principal purpose of the parties is ascertainable it is given great weight."). Under that standard, the interpretation that most fully advances the goals underlying the inclusion of a particular provision will generally be adopted.

B.

A condemnation clause, like the one at issue, is a common feature in commercial leases. *See New Haven Unified Sch. Dist. v. Taco Bell Corp.*, 24 Cal.App.4th 1473, 30 Cal.Rptr.2d 469, 473 (1994); *see also* 2A *Nichols on Eminent Domain, supra,* § 5.02[6][b]. It serves to delineate the rights and responsibilities of the lessor and the lessee where the landlord's property is subject to condemnation. It operates to terminate an existing lease and deny monetary compensation to a tenant where the landlord's property is taken or conveyed by agreement in lieu of condemnation. 2A *Nichols on Eminent Domain, supra,* § 5.02[6][b]; 2 *Friedman on Leases* § 13:4 (Patrick A. Randolph ed.2009). The clause is intended to address the landlord's concern that compensation payable to it will be consumed by tenants who have a claim for the value of their leases. 2 *Friedman on Leases, supra,* § 13:4; *see also United States v. 8286 Sq. Ft. of Space*, 61 *F.Supp.* 737, 741 (D.Md.1945) ("It is doubtless true that the condemnation clause is inserted primarily for the benefit of the landlord and to preclude any diminution of the condemnation award to him [because of] the participation of the tenant in the benefits of the award"); *In re Condemnation by Dep't of Transp.*, 871 *A.*2d 896, 900–01 (Pa.Commw.Ct.2005) (citing *Appeal of Scholl*, 292 *Pa.* 262, 141 *A.* 44, 45 (1928)). In effect, a condemnation clause is a waiver of the right the tenant would otherwise have to share in the landlord's condemnation award.

Because such a clause works a forfeiture on the tenant, it should be strictly construed. 2 *Friedman on Leases, supra,* § 13:4; 2A *Nichols on Eminent Domain, supra,* § 5.02[6][b]; *see also Urban Renewal Agency of Salem v. Wieder's Inc.*, 53 *Or.App.* 751, 632 *P.*2d 1334, 1337, *petition denied*, 292 *Or.* 334, 644 *P.*2d 1127 (1981); *Maxey v. Redevelopment Auth. of Racine*, 94 *Wis.*2d 375, 288 *N.W.*2d 794, 806–07 (1980). In other words, unless the clause is crystal clear, forfeiture should not occur. 2 *Friedman on Leases, supra,* § 13:4 ("The effect of these clauses is to destroy an estate and accordingly they are construed strictly against the forfei-

ture."); 2A *Nichols on Eminent Domain, supra,* § 5.02[6][b] ("A lease covenant will be construed not to have that effect if its language and the circumstances possibly permit."). That approach is consistent with the principle that our law abhors a forfeiture. *Kutzin v. Pirnie,* 124 *N.J.* 500, 516, 591 *A.2d* 932 (1991); *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.,* 100 *N.J.* 166, 182, 495 *A.2d* 66 (1985); *Lehigh Valley R.R. Co. v. Chapman,* 35 *N.J.* 177, 188, 171 *A.2d* 653, *cert. denied,* 368 *U.S.* 928, 82 *S.Ct.* 364, 7 *L.Ed.2d* 192 (1961); *Rosen v. Smith Barney, Inc.,* 393 *N.J.Super.* 578, 587, 925 *A.2d* 32 (App.Div.2007), *aff'd,* 195 *N.J.* 423, 950 *A.2d* 205 (2008); *Porter & Ripa Assoc., Inc. v. 200 Madison Ave. Real Estate Group,* 167 *N.J.Super.* 48, 55, 400 *A.2d* 508 (App.Div.1979); *see also* 5 *Corbin on Contracts, supra,* § 24.22 ("There is judicial preference for interpretations that do not result in forfeiture . . . .").

## C.

Applying those standards, we are satisfied that James has the better of the argument. We recognize that, in a vacuum, the words "any portion thereof" could conceivably support DVL's contention that the condemnation of James's leasehold was a triggering event under the condemnation clause. Indeed, that is what the courts below held. However, the language of the condemnation clause must be viewed holistically, in light of its purpose, and in light of relative interpretive canons; thus we are ineluctably drawn to conclude otherwise.

We refer again to the purpose behind a lease condemnation clause: to protect the landlord's interest in *its own award* when the fee is taken. 2 *Friedman on Leases, supra,* § 13:4. That is exactly what the language in the lease provides, insofar as the parties agreed that James would have "no claim" to any amount "awarded as damages" in condemnation or paid as "the purchase price" to the landlord in lieu of formal condemnation. To apply the condemnation clause as DVL suggests would not advance the purpose underlying it at all insofar as DVL's interest in the

property remains intact; it has not been awarded damages or been paid a purchase price; and James is not seeking to obtain an allocation of a condemnation award to DVL, but only to receive just compensation for the loss of its leasehold interest.

With that as our point of departure, we turn to the specific language of the lease to ascertain whether there is something in it that would support the interpretation advanced by DVL—that the clause was intended not only to protect an award to the landlord, but also to bar the payment of damages by a municipality to the lessee, independent of the taking of the fee. In our view, there is not.

We note that the descriptions of "complex" and "premises" in the lease are of real property—160 Passaic Avenue and approximately 13,000 square feet in specific buildings. It is Kearny's condemnation of that real property that is the focus of the condemnation clause when it speaks of the taking of the "complex" or the "premises" or "a portion thereof." That that is so is underscored by the language of the condemnation clause which references the landlord's *sale* of the premises; the tenant's obligation to "deliver any instruments ... *to effectuate a proper transfer of title to such public authority* " (emphasis added); and, most significantly, to the governmental entity "seeking to take *said land or any portion thereof.*" (Emphasis added).

Taken together, those words and phrases seamlessly intermesh with the notion that it is the landlord's award for the fee interest in the "land or any portion thereof" that is the operative principle in the condemnation clause. There is simply nothing in the language of the clause to suggest an intention to bar a claim by a lessee or an easement holder when the landlord's fee is not at stake. Moreover, even if we viewed the clause as ambiguous, which we do not, we could not accept DVL's interpretation because it would effect a forfeiture on James—a result that should not be countenanced in the absence of clear language to that effect.

That said, DVL is correct that James would likely have received nothing if Kearny had chosen a different developer. However, the conclusion DVL derives from that fact—that the happenstance that DVL is the developer should not alter the outcome—does not follow. The reason is that any other developer would have had to condemn or purchase DVL's fee interest, thus triggering the condemnation clause.

Kearny raises a similar no-harm no-foul argument—that it *could have* condemned DVL's property or that it *could have* purchased it for some small amount of money, and that, in those instances, James would have received nothing under the condemnation clause. It remains the fact, however, that Kearny chose neither of those paths and that the condemnation clause was not triggered.

In arguing as they do, Kearny and DVL appear to believe that the contract between DVL and James provides that any condemnation of any interest of any party would activate the condemnation clause. Although the parties could have written such a contract, they did not. Our commission is simply to decode their symbols of expression and enforce them.

Applying the relevant standards, we have concluded that DVL's approach does not account for the full language of the lease, *Schnakenberg, supra,* 37 *N.J.Super.* at 155, 117 *A.2d* 191, is completely out of synchronicity with the purposes underlying a condemnation clause, 2 *Friedman on Leases, supra,* § 13:4, and is, at best, ambiguous and thus not clear enough to justify what is, in effect, a forfeiture of James's right to just compensation. 2 *Friedman on Leases, supra,* § 13:4; 2A *Nichols on Eminent Domain, supra,* § 5.02[6][b]. As such, we hold that the clause will not be enforced in these circumstances.

In light of what we have said, the judgment in favor of Kearny cannot stand. The matter is remanded to the trial court for the dismissal of the condemnation complaint. If a new complaint is filed against James, DVL must engage in bona fide negotiations with James on behalf of Kearny.

### IX.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for proceedings consistent with the principles to which we have adverted.

Justice LaVECCHIA, dissenting.

This appeal presents an issue of contract interpretation that divides the Court. Specifically, two approaches to construction of a condemnation provision in a lease are pitted against one another. The majority reverses based on a presumption that the condemnation provision of a lease becomes operative only when some portion of a landlord's fee interest is condemned. However, I believe that the terms of an arms-length negotiated commercial lease should control and must be applied as written. The facts that give rise to the present action are within the ambit of the condemnation provision at issue, therefore, I must respectfully dissent. I would affirm the Appellate Division judgment that enforced the condemnation provision and cut off the lessee's right to any compensation.

### I.

The Eminent Domain Act, *N.J.S.A.* 20:3–1 to –50, requires negotiation between the condemnor and the "condemnee holding the title of record to the property." *N.J.S.A.* 20:3–6. The majority quite rightly observes that absent a specific contractual allocation of rights, a redeveloping body taking only a lease interest would be required to negotiate proper compensation with a lessee, who would be "the owner of [the] interest in the private property being condemned." *N.J.S.A.* 20:3–2(c) (defining "condemnee"); *see ante* at 404–06, 16 *A.*3d at 311–12. However, in this case the lessee had contractually stipulated that in any conveyance of the property "or any portion thereof" to a redeveloping body, the right to bargain and to receive compensation was solely the landlord's. *See City of Atlantic City v. Cynwyd Invs.*, 148 *N.J.* 55, 72, 689 *A.*2d 712 (1997) (explaining that the rights for a long-term leaseholder in a taking can "depend on the contract"); *United*

*States v. 8286 Square Feet of Space in Paca–Pratt Bldg.*, 61 *F.Supp.* 737, 741 (D.Md.1945) ("[I]f by the proper construction of the [condemnation] clause the interest of the tenant is ended and determined by the fact of condemnation, then the tenant has no compensable interest in the property condemned."). The allocation of that right to the landlord in this commercial lease was the product of arms-length negotiation between sophisticated bargaining parties. Specifically, the lease contained a condemnation provision that stated:

> If the Complex of which the Premises are a part, or any portion thereof, shall be taken under eminent domain or condemnation proceedings, or if suit or other action shall be instituted for the taking or condemnation, or if in lieu of any formal condemnation proceedings or actions, Landlord shall grant an option to purchase and or shall sell and convey the Premises or any portion thereof, to the governmental or other public authority, agency, body or public utility, seeking to take said land or any portion thereof, then this lease, at the option of the Landlord, shall terminate, and the term hereof shall end as of such date as Landlord shall fix by notice in writing; and Tenant shall have no claim or be entitled to any portion of any amount which may be awarded as damages or paid as the result of such condemnation proceedings or paid as the purchase price for such option, sale or conveyance in lieu of formal condemnation proceedings; and all rights of the Tenant to damages, if any, are hereby assigned to the Landlord. The Tenant agrees to execute and deliver any instruments, at the expense of the Landlord, as may be deemed necessary or required to expedite any condemnation proceedings or to effectuate a proper transfer of title to such public authority, seeking to take or acquire the Premises or any portion thereof. Tenant covenants and agrees to vacate the Premises, remove all the Tenant's personal property and deliver up peaceable possession thereof to Landlord, or to such other party designated by Landlord in the aforementioned notice. Failure by Tenant to comply with any provisions in this clause shall subject Tenant to such costs, expenses, damages and losses as Landlord may incur by reason of Tenant's breach hereof.

The trial court, on remand from the Appellate Division with instructions to consider the intended effect of that provision, heard from the parties and concluded that the reference to "the Premises or any portion thereof" in the condemnation provision of the lease demonstrated that the parties considered and allowed for the provision to apply in a variety of condemnation proceedings, and not only those in which the landlord's fee interest in the property is taken. Furthermore, the court found that the provision specifically contemplated and permitted a class of "friendly" condemnation proceedings, based on the provision authorizing the landlord

to "grant an option to purchase and or sell and convey the Premises or any portion thereof, to the governmental or other public authority ... seeking to take said land or any portion thereof." The court reasoned that that language acknowledged that the landlord's participation in the variety of initiating steps to a governmental condemnation would not provide a basis for conferring on the tenant a compensable interest in the condemnation.

The Appellate Division, in an unpublished opinion, affirmed the trial court's logical and persuasive reading and application of this contractual condemnation provision. Although a majority of our Court now reverses, I respectfully dissent. I would affirm the Appellate Division.

In my view, the majority reverses based on a presumption that the condemnation provision of a lease becomes operative only when some portion of a landlord's fee interest is condemned. And, it engages in an unduly narrow interpretation of the word "portion," ascribing to it a meaning that limits the clause's application only to takings of some physical part of the landlord's fee interest in the property.[1] In my view, the colloquial interpretation of a "portion" of the property adopted by the majority, one that requires a taking of some portion of the fee in order to trigger the condemnation clause, is wrongly based on treatises' generalized discussion of the purpose of condemnation clauses in leases.[2] *See*

---

[1] Under the majority's interpretation, the leasehold owner would have no right to compensation so long as any portion of the fee interest containing the leasehold was condemned, whether it was 1 percent or 99 percent of that fee interest. The majority recognizes that property encompasses a host of interests, including fee interests, leasehold interests, easement interests, etc. *See ante* at 404–07, 16 *A*.3d at 311–13. There simply is nothing in the condemnation provision that even suggests it only applies when the property rights encompassed by a fee interest, rather than other possessory interests, are taken.

[2] In fact, condemnation clauses have a number of salutary purposes: they "enable [a] landlord to terminate [a] leasehold interest in the event of condemnation or its equivalent" without dispute or litigation; they allow for clear allocations of condemnation proceeds; they ensure no party reaps "a windfall"; and they minimize the "delay between [the] taking [of a property] and its utilization."

*ante* at 412–14, 16 *A*.3d at 316–17. Such an artificial interpretation of that term, particularly as used in the context of this provision as a whole, required substantial evidence to support such intent by the parties that negotiated the contract. The majority points to no such evidence, nor can it: no such evidence was advanced before the remand court. The majority's circumscribed interpretation does injustice to the wording of the provision actually agreed to as a result of the parties' arms-length negotiation of this commercial lease. Indeed, the majority has rewritten a better contract for this lessee than the one for which it bargained. Furthermore, the majority's decision may well bring instability and uncertainty to a great many existing commercial leases in this State.[3]

Here, by the terms negotiated by the parties to this lease-contract, the landlord possessed the only interest compensable in a taking. The right to negotiate the value of that interest—entwined with the formal requirements of *N.J.S.A.* 20:3–6 that ensure procedural fairness between negotiating parties and that facilitate mutual agreement where hostile takings can be avoided—logically belongs to the only party entitled to receive compensation in a taking, friendly or otherwise. There is no evidence that the negotiation requirements of the Eminent Domain Act

---

*Twp. of Bloomfield v. Rosanna's Figure Salon, Inc.*, 253 *N.J.Super.* 551, 559–60, 602 *A*.2d 751 (App.Div.1992).

[3] A narrow reading of the majority's holding would allow a landlord-redeveloper with an existing lease to ensure that its condemnation clause is not circumvented by engaging in one of two procedural tactics: (1) naming the fee interest itself in a condemnation complaint even though only the lease interest is actually sought; or (2) having the municipality purchase the fee interest from the landlord for nominal compensation and then returning the property to the landlord-redeveloper. *See ante* at 414–15, 16 *A*.3d at 317–18. To the extent that these avenues would be open to a redeveloper in a similar position as here, the majority opinion is elevating form over substance. Here, it allows a poorly drafted complaint to control the disposition of the case, despite the existence of a contract that reveals exactly how the parties intended to allocate compensation in the event the property was taken for redevelopment.

were intended to override a contract's assignment of the right to compensation.

Finally, it bears emphasizing that the proceedings here were not untoward in any way, despite James's [4] efforts to cast them in such light; as a result, a balancing of the equities also does not justify the majority's result.

The recently decided *Iron Mountain Information Management Inc. v. City of Newark,* 202 *N.J.* 74, 995 *A.*2d 841 (2010), illustrates the point. It held that a leaseholder is not statutorily entitled to actual notice of a potential blight designation under the Local Redevelopment and Housing Law (LRHL), *N.J.S.A.* 40A:12A–1 to –49. *Iron Mountain, supra,* 202 *N.J.* at 78–79, 995 *A.*2d 841. We found no due process violation on the facts of that case. *Id.* at 79, 995 *A.*2d 841. Similarly, if *Iron Mountain* retains any validity, the facts of this case can present no discernable due process violation of the leaseholder's rights, as the majority opinion appropriately reflects. *See ante* at 403–05, 16 *A.*3d at 310–13. The leaseholder here had exactly the same notice, and the same ability to challenge the blight designation as did the lessee in *Iron Mountain.* Moreover, any lessee has the power to protect his own interest by recording his name in the official tax records, thus entitling him to the same personalized notice of a proposed blight designation that is due an owner of property. *See Harrison Redevelopment Agency v. DeRose,* 398 *N.J.Super.* 361, 413, 942 *A.*2d 59 (App.Div.2008) (holding that where "contemporaneous individual written notice" is not provided to party with recorded interest, that party retains power to challenge redevelopment designation beyond ordinary statutory period); *see also N.J.S.A.* 40A:12A–6(b)(3) ("[N]otice shall ... be sent to all persons ... whose names are noted on the assessment records as claimants of an interest in any such parcel."). James chose not to protect its interests in this manner.

---

[4] Party designations used by the majority opinion are retained here.

Furthermore, a deeper look into the proceedings illustrates that there is nothing unseemly about the exercise of eminent domain here. The lease between DVL and James was agreed upon in 1995, and the blight designation was made, in the face of DVL's challenge, in 2000. Only in 2006 did the town appoint DVL redeveloper because the original redeveloper had unexpectedly dropped out. Before DVL knew it would have any role in the redevelopment the following had occurred: a comprehensive redevelopment plan was formulated and included James's property; James's right to challenge the blight designation had expired; and James had bargained away by contract its right to receive compensation in a taking, friendly or otherwise.

To conclude, there is nothing in the lease which even suggests that its terms do not apply where the landlord is the developer or where no portion of the landlord's fee interest is taken. The lease would have deprived the tenant of any compensable interest in the condemnation if the original developer proceeded. Similarly, the tenant would not have had any compensable interest if its landlord, DVL, abandoned the project and another developer was substituted. There is simply nothing in this commercial lease to even suggest the rights of the tenant are affected, or should be affected, by the city's designation of the landlord as its redevelopment agent. The majority's decision upends the established and customary meaning of a lease provision at use in countless commercial leases throughout this state and fails to demonstrate any equitable basis for the relief it affords. Indeed, in the absence of any showing whatsoever of the parties' intent that would overcome the clear language of the lease-contract, I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, ALBIN and HOENS—4.

*For affirmance*—Justices LaVECCHIA, RIVERA–SOTO and STERN (temporarily assigned)—3.